# 25-2204-cv

## United States Court of Appeals
*for the*
## Second Circuit

EAST COAST ADVANCED PLASTIC SURGERY, LLC,
MARCELLA LIVOLSI,

*Plaintiffs-Appellants,*

– v. –

CIGNA HEALTH AND LIFE INSURANCE COMPANY, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, MULTIPLAN, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR PLAINTIFFS-APPELLANTS**

MICHAEL B. WOLK
LAW OFFICES OF
MICHAEL B. WOLK, P.C.
155 East 55th Street, Suite 300B
New York, New York 10022
(917) 238-0576

– and –

ELIZABETH WOLSTEIN
SAMUEL L. BUTT
DAVID J. GOLDSMITH
SCHLAM STONE & DOLAN LLP
26 Broadway, 19th Floor
New York, New York 10004
(212) 344-5400

*Attorneys for Plaintiffs-Appellants*

COUNSEL PRESS (800) 4-APPEAL • (388210)

**UNITED STATES COURT OF APPEALS**
**SECOND CIRCUIT**

| | |
|---|---|
| EAST COAST ADVANCED PLASTIC SURGERY, LLC, MARCELLA LIVOLSI<br><br>*Plaintiffs-Appellants,*<br><br>-against-<br><br>CIGNA HEALTH AND LIFE INSURANCE COMPANY, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, MULTIPLAN, INC.<br><br>*Defendants-Appellees.* | Case No. 25-CV-2204<br><br>**RULE 26.1 DISCLOSURE STATEMENT** |

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiff-Appellant East Coast Advanced Plastic Surgery, LLC ("ECAPS"), by its undersigned counsel, certifies that it has no parent corporation, and that there is no publicly held corporation owning 10% or more of its stock.

Dated: December 24, 2025

**LAW OFFICES OF MICHAEL B. WOLK, P.C.**

By: /s/ Michael B. Wolk____________
Michael B. Wolk
155 East 55th Street, Suite 300B New York, New York 10022
Tel: (917) 238-0576
Email: michael.wolk@wolkgroup.com

- and -

**SCHLAM STONE & DOLAN LLP**

By: /s/ Elizabeth Wolstein
Elizabeth Wolstein
Samuel L. Butt
David J. Goldsmith
26 Broadway, 19th Floor
New York NY 10004
Tel.: (212) 344-5400
Fax: (212) 344-7677
Email: ewolstein@schlamstone.com
Email: sbutt@schlamstone.com
Email: dgoldsmith@schlamstone.com

*Attorneys for Plaintiff-Appellant East Coast Advanced Plastic Surgery, LLC*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 1

JURISDICTIONAL STATEMENT ........ 6

STATEMENT OF ISSUE PRESENTED FOR REVIEW ........ 7

STATEMENT OF THE CASE ........ 8

1. ECAPS's Specialized Breast Cancer Patient Reconstruction Practice ........ 8

2. MPI's And Cigna's Roles In The Employer Health Plan Market ........ 8

3. ECAPS's May 2012 Contract With MPI ........ 10

4. Cigna's Course Of Underpayments And Nonpayment For ECAPS's Services To Its Plan Members ........ 12

5. Cigna Refuses To Pay The Awards ECAPS Obtains Via The NSA's Independent Dispute Resolution Process ........ 13

*a.) The NSA's Statutory Arbitration Regime: The Independent Dispute Resolution Process* ........ 13

*b.) ECAPS's IDR Awards And Cigna's Refusal To Pay Any Of Them* ........ 16

6. ECAPS's Complaint And The Claim Asserting Violation Of Its Right To Payment Of Its IDR Awards ........ 16

7. The District Court Decision ........ 18

SUMMARY OF THE ARGUMENT ........ 21

STANDARD OF REVIEW ........ 24

ARGUMENT ........ 25

I. THE NSA AFFORDS PROVIDERS A PRIVATE RIGHT OF ACTION TO ENFORCE THEIR INDEPENDENT DISPUTE RESOLUTION AWARDS ........ 25

A. Legal Standards – Private Right of Action ........ 25

B. The NSA's Text And Structure Reflect Congress's Intent To Create A Private Remedy For Out-Of-Network Providers Like ECAPS ........ 27

1. The NSA Replaces The Patient's Obligation To Pay The Provider With The Group Health Plan's Obligation To Pay The Provider ........ 27

2. The NSA's Use Of Rights-Creating Language Carries A Remedy To Give Effect To The Providers' Statutory Right To Be Paid By Group Health Plans ..... 29

3. By Making IDR Determinations "Binding" Congress Made Them Judicially Enforceable ..... 33

4. Congress Did Not Provide For Administrative Enforcement To Collect Unpaid IDR Determinations ..... 36

*a.) The Provisions Cited By The District Court Do Not Allow For HHS Enforcement Of IDR Determinations* ..... 37

*b.) The Civil Penalty Provisions Of The Public Health Service Act Do Not Authorize HHS Enforcement For Failure To Pay IDR Awards* ..... 38

C. The Fifth Circuit's Superficial Reading Of Selective IDR Provisions Is Not Persuasive ..... 40

1. The Fifth Circuit Relied On The Penalty Provision While Ignoring Its Express Limitation On HHS's Enforcement Authority To "Health Insurance Coverage" Transactions ..... 40

2. The Fifth Circuit Cherry Picked A Term To Interpret That Congress Did Not Use While Ignoring The Actual Language And Structure Of The IDR Regime ..... 41

3. Denying A Private Enforcement Remedy Renders Meaningless The Entire IDR Statutory Regime ..... 46

II. IF THE LOWER COURT'S ADDITIONAL DECLARATORY JUDGMENT RULING APPLIES TO THE IDR CAUSE OF ACTION IT IS WRONG AND IS NOT A PROPER BASIS FOR DISMISSAL ..... 48

A. Count 8 Does Not Fail To State A Claim Simply Because It Seeks A Declaratory Judgment Remedy Together With The Pleading Of An Underlying Substantive Claim Seeking Payment Of ECAPS's IDR Awards ..... 49

B. The Absence Of A Private Right Of Action Does Not Foreclose Declaratory Relief ..... 51

CONCLUSION ..... 54

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alexander v. Sandoval*,
532 U.S. 275 (2001)....................*passim*

*Armstrong v. Exceptional Child Ctr.*,
575 U.S. 320 (2015)....................19

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)....................31

*Cannon v. University of Chicago*,
441 U.S. 677 (1979)....................26

*Cheminova A/S v. Griffin L.L.C.*,
182 F. Supp. 2d 68 (D.D.C. 2002)....................35, 44, 45

*Chevron Corp. v. Naranjo*,
667 F.3d 232 (2d Cir. 2012)....................49, 50

*Collins v. Putt*,
979 F.3d 128 (2d Cir. 2020)....................24

*Dolan v. Connolly*,
794 F.3d 290 (2d Cir. 2015)....................24

*Gem Fin. Serv., Inc. v. City of New York*,
2014 WL 1010408 (E.D.N.Y. Mar. 17, 2014)....................51

*Gen. Drivers, Warehousemen & Helpers, Loc. Union No. 89 v. Riss & Co.*,
372 U.S. 517 (1963)....................34

*Gorss Motels, Inc. v. Lands' End, Inc.*,
997 F.3d 470 (2d Cir. 2021)....................43

*GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*,
2023 WL 5815821 (D.N.J. Sept. 8, 2023)....................45

*Guardian Flight LLC v. Aetna Life Insurance Company*,
789 F. Supp.3d 214 (D. Conn. 2025)....................*passim*

*Guardian Flight, L.L.C. v. Health Care Serv. Corp.*,
140 F.4th 271 (5th Cir. 2025) .......................................................... *passim*

*In re GEICO Customer Data Breach Litig.*,
691 F. Supp.3d 624 (E.D.N.Y. 2023) .......................................................... 50, 51

*In re Joint E. & S. Dist. Asbestos Litig.*,
14 F.3d 726 (2d Cir. 1993) .......................................................... 49, 50

*Int'l Molders & Allied Workers Union, Loc. No. 164 v. N.L.R.B.*,
765 F.2d 858 (9th Cir. 1985) .......................................................... 35

*Kallen v. Dist. 1199, Nat. Union of Hosp. & Health Care Emp.*,
574 F.2d 723 (2d Cir. 1978) .......................................................... 35

*Key Tronic Corp. v. United States*,
511 U.S. 809 (1994) .......................................................... 31

*Lander Co. v. MMP Invs., Inc.*,
107 F.3d 476 (7th Cir. 1997) .......................................................... 35

*Maine Community Health Options v. United States*,
590 U.S. 296 (2020) .......................................................... 26, 30, 31, 46

*Monsalvo Velazquez v. Bondi*,
604 U.S. 712 (2025) .......................................................... 43

*Murphy Med. Assocs., LLC v. Yale Univ.*,
120 F.4th 1107 (2d Cir. 2024) .......................................................... 26

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
933 F.3d 99 (2d Cir. 2019) .......................................................... 25

*Porter v. Thompson Roofing & Sheet Metal Co.*,
242 F.3d 367 (2d Cir. 2000) .......................................................... 34

*Publicis Commc'n v. True N. Commc'ns, Inc.*,
206 F.3d 725 (7th Cir. 2000) .......................................................... 34

*Qorvis Commc'ns, LLC v. Wilson*,
549 F.3d 303 (4th Cir. 2008) .......................................................... 34

*Republic of Iraq v. ABB AG*,
768 F.3d 145 (2d Cir. 2014) ....................................................................25

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
397 F.3d 56 (1st Cir. 2005)...............................................................32, 33

*Starter Corp. v. Converse, Inc.*,
170 F.3d 286 (2d Cir. 1999) ....................................................................53

*Toretto v. Donnelley Fin. Sols., Inc.*,
583 F. Supp. 3d 570 (S.D.N.Y. 2022) ......................................................51

*Travis v. Navient Corp.*,
460 F. Supp. 3d 269 (E.D.N.Y. 2020) ......................................................51

*Troll Co. v. Uneeda Doll Co.*,
483 F.3d 150 (2d Cir. 2007) ....................................................................47

*Worldwide Aircraft Servs. Inc. v. Worldwide Ins. Servs. LLC*,
2024 WL 4226799 (M.D. Fla. Sept. 18, 2024)...........................................45

**Statutes**

9 U.S.C. § 9 ...........................................................................................45

9 U.S.C. § 10(a) ...........................................................................15, 22, 45, 46

9 U.S.C. § 201 ...........................................................................................34

28 U.S.C. § 1291 ..........................................................................................6

28 U.S.C. § 2201(a) .................................................................................5, 52, 53

28 U.S.C. § 2202 ......................................................................................5, 53

29 U.S.C. § 1185e(a)(3)(G)(i)......................................................................15

29 U.S.C. § 1185e(a)(3)(K) .........................................................................28

29 U.S.C. § 1185e(a)(3)(K)(ii)(II) ...............................................................28

29 U.S.C. § 1185e(b)(1)..............................................................................15

29 U.S.C. § 1185e(b)(1)(A) .........................................................................27

29 U.S.C. § 1185e(b)(1)(D) ........ 16, 28, 30
29 U.S.C. § 1185e(c)(1)(A) ........ 14
29 U.S.C. § 1185e(c)(1)(B) ........ 14
29 U.S.C. § 1185e(c)(2) ........ 15, 19, 37
29 U.S.C. § 1185e(c)(2)(A) ........ 20, 36
29 U.S.C. § 1185e(c)(4) ........ 36
29 U.S.C. § 1185e(c)(4)(F)(i) ........ 38
29 U.S.C. § 1185e(c)(5) ........ 15
29 U.S.C. § 1185e(c)(5)(E)(i) ........ 44
29 U.S.C. § 1185e(c)(5)(E)(i)(I) ........ 15, 33
29 U.S.C. § 1185e(c)(5)(E)(i)(II) ........ 15, 41
29 U.S.C. § 1185e(c)(5)(E)(iv) ........ 36
29 U.S.C. § 1185e(c)(6) ........ 15, 16, 17, 28, 30
29 U.S.C. § 1185e(c)(9) ........ 32
42 U.S.C. § 300gg-22(a)(2) ........ 38, 39, 40
42 U.S.C. § 300gg-22(b) ........ 38
42 U.S.C. § 300gg-22(b)(1) ........ 40
42 U.S.C. § 300gg-22(b)(1)(A) ........ 38
42 U.S.C. § 300gg-22(b)(2)(A) ........ 38, 39, 40
42 U.S.C. § 300gg-22(b)(2)(C)(iii) ........ 39
42 U.S.C. § 300gg-22(E)(i) ........ 43
42 U.S.C. § 300gg-22(E)(iii) ........ 43
42 U.S.C. § 300gg-111(b)(1)(D) ........ 28

42 U.S.C. § 300gg-111(c)(4) .......... 36

42 U.S.C. § 300gg-132(a) .......... 27

42 U.S.C § 1983 .......... 33

Pub. Law 116-260, 134 Stat. 1182 (Dec. 27, 2020) .......... 1

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 24

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) .......... 37-38, 42, 43

H.R. Rep. No. 116-615 (Dec. 2, 2020) .......... 14, 29

# PRELIMINARY STATEMENT

Congress passed the No Surprises Act ("NSA"), Pub. Law 116-260, 134 Stat. 1182 (Dec. 27, 2020), effective January 1, 2022, and codified as amendments to ERISA and other statutes, to address "surprise" medical bills. As relevant here, the NSA defines surprise medical bills to include bills for medical services provided by out-of-network providers to patients covered by ERISA-regulated group health plans. Congress determined that, in this out-of-network context, it is group health plans, not patients, that should be liable for out-of-network provider charges.

Thus, at the heart of the NSA is a fee-shifting structure: (i) the patient cannot be charged more for an out-of-network medical service than he or she would pay if the same service was provided by an in-network provider; (ii) the out-of-network provider (and the group health plan) cannot bill the patient for more than the amount the patient would pay for an in-network provider; and (iii) the group health plan "shall pay" the provider its applicable out-of-network charges.

The NSA establishes multiple methods for determining a provider's applicable out-of-network charges. The parties, for example, may have previously agreed upon a rate, or, relevant here, the parties may arrive at the rate via a non-mandatory arbitration-like Independent Dispute Resolution (IDR) process. In the IDR process, the parties select an arbitrator and participate in a baseball style arbitration in which each side submits its proposed charge for the medical services at issue, defined in the

NSA as the "out-of-network rate," to the arbitrator. The arbitrator chooses one side's number as the out-of-network rate amount and issues the IDR award in that amount. The NSA specifies that IDR award is "binding," must be paid by the health plan "directly" to the provider within 30 days, and is not subject to judicial review, except on the narrow grounds for vacatur of an arbitration award contained in Section 10 of the Federal Arbitration Act ("FAA").

This appeal arises out of the refusal of Defendants-Appellees Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company (together, "Cigna"), acting as a fiduciary and claims administrator for group health plans, to pay the IDR awards obtained by Plaintiff-Appellant East Coast Advanced Plastic Surgery LLC ("ECAPS"). ECAPS is a surgical practice that performs medically necessary, highly specialized post-mastectomy breast reconstruction surgeries. ECAPS is an out-of-network provider under the NSA in relation to Cigna-administered group health plans.

Pursuant to an out-of-network provider contract with a market intermediary described below, ECAPS has delivered its specialized surgical services to hundreds of patients that are members of Cigna-administered group health plans. ECAPS invoked the IDR process for some of its claims for payment, and it is only those unpaid IDR awards that are the subject of this appeal. ECAPS's independent rights to recover for other unpaid services are not at issue on this appeal. Cigna has not paid

any of the IDR awards obtained by ECAPS, which as of the filing of the Complaint totaled more than $3 million, and have now ballooned well beyond that sum.

Count 8 of the Complaint alleges that the NSA mandates payment of IDR awards directly to the provider within 30 days, that Cigna-administered group health plans have never paid any of the IDR awards obtained by ECAPS, and that ECAPS has a statutory right to payment of the awards. The district court granted Cigna's motion to dismiss this claim on the ground that the NSA does not provide a private right of action to enforce the IDR awards.

To reach that conclusion the district court disregarded the relevant language and structure of the NSA. The central design of the statute is to replace the patient with the group health plan as the payor of the provider's out-of-network charges. Accordingly, the statute mandates that health plans "shall pay" providers an "out-of-network rate," which may be determined via the IDR process, in which case the plans "shall" make payment to the provider within 30 days of the IDR award. This is strong "rights-creating" language of the kind the Supreme Court has determined reflects Congress's intent to create a private right of action. In addition, Congress expressly made the IDR determinations "binding" to indicate that once issued, they are ripe for judicial enforcement if not paid within the 30-day statutory deadline.

The district court turned the statutory regime on its head by incorrectly interpreting the limitation on judicial review on a challenge to an IDR award as if that

were legally synonymous with a ban on judicial enforcement of the award. Judicial review in the ordinary sense refers to the power to set aside an act. Enforcement, by contrast, denotes the power to compel compliance with the act. Thus, a limitation on the scope of "judicial review" cannot reasonably be interpreted as a comprehensive prohibition on the opposite act of compelling compliance.

In addition, the district court's ruling that an adequate administrative remedy exists for unpaid out-of-network providers, consisting of the IDR process itself and the supposed oversight of the Department of Health and Human Services (HHS), reflects a misapprehension of the express terms of the statute. The NSA does not authorize HHS (or other federal agency) to compel health plans to pay unpaid IDR awards. Further, the NSA's administrative penalty provisions do not authorize HHS to impose penalties for a health plan's failure to pay IDR awards, but rather for violations relating only to transactions relating to "health insurance coverage."

In addition, the district court's interpretation renders meaningless the entire IDR statutory regime Congress established. If health plans and their agent-fiduciaries like Cigna are allowed to ignore the NSA's mandate that they "shall pay" a "binding" IDR award "directly" to an out-of-network provider within 30 days—and if they can never be compelled by courts to comply with their statutory obligations—then those statutory requirements are mere surplusage without any legal effect.

Finally, even if the Court were to conclude that providers lack a private remedy to enforce their IDR awards, that should not end ECAPS's cause of action to the extent it seeks a declaratory judgment remedy. The Declaratory Judgment Act expressly states that a court may issue a declaratory judgment "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Thus, whether or not further relief can be sought via a private right of action, the district court may still render a declaratory judgment remedy. In other words, the availability of declaratory relief is not dependent upon the existence of a private right of action. A declaratory judgment may then be the basis of "further necessary or proper" relief such as an injunction or damages, 28 U.S.C. § 2202.

Accordingly, the Court should reverse the judgment to the extent it dismissed Count 8 of the Complaint for failure to state a claim.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, because ECAPS appeals from a final judgment of the district court, which was premised upon the court's order granting Cigna's motion to dismiss ECAPS's complaint. This appeal is thus from a final judgment that disposes of all parties' claims, which also brings up for review all prior orders.

This appeal is timely. The final judgment ("Judgment") was entered on August 15, 2025 (JA 136), and ECAPS timely filed its Notice of Appeal on September 11, 2025. (JA 137-38).

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether the NSA provides a private right of action to an out-of-network medical provider such as ECAPS to enforce Independent Dispute Resolution (IDR) awards—which reflect payment for medical services the provider has rendered to a health plan subscriber—obtained pursuant to the NSA's statutory IDR scheme, where the text and structure of the statute reflect Congress's intent to imply a private remedy to compel payment of the award and the statute does not provide any other mechanism for compelling a group health plan to pay the provider's award.

The district court incorrectly answered no.

## STATEMENT OF THE CASE

### 1. ECAPS's Specialized Breast Cancer Patient Reconstruction Practice

ECAPS is a surgical practice that offers specialized breast cancer reconstruction services to women in connection with medically necessary mastectomies. ECAPS's two co-founding surgeons are board-certified by the American Board of Surgery and the American Board of Plastic Surgery and are ranked by those associations in the top 1% of the country for their surgical expertise in breast cancer reconstruction. The surgeons received highly specialized training in microsurgical breast reconstruction expertise under the direct supervision of a nationally acclaimed pioneer in the highly complex field of breast reconstruction microsurgery known as a Deep Inferior Epigastric Artery Perforator Flap. ECAPS has helped thousands of women who have undergone medically necessary mastectomies work toward regaining their physical and emotional health as well as their identity and sense of self. (JA 18-20, Compl. ¶¶ 21-25).

### 2. MPI's And Cigna's Roles In The Employer Health Plan Market

Defendant MultiPlan, Inc. ("MPI") is an intermediary in the group health plan market known as a preferred provider organization ("PPO"). As a core component of its PPO business, MPI assembles networks of providers (an "MPI Network") that are contractually obligated to provide their medical services to patients associated with MPI's "Clients" and "Users," which are typically group health plans and their

agent-fiduciaries. (JA 15-16, 20-21, Compl. ¶¶ 15, 28-29). MPI sells Clients access to an MPI Network via contracts that allow the plan or its fiduciary to offer plan members access to medical services offered by providers who are out of the plan network but within a separate and independent MPI Network. In return, MPI's Clients agree to pay the providers for the services to its plan members at a discounted rate specified by contract, and MPI promises to facilitate such payment. (JA 15-16, 20-21, 26, Compl. ¶¶ 15, 29, 46).

Employer health plans typically contract with a third-party Claims Administrator such as Cigna, delegating the discretionary power to administer all aspects of the plan's benefits. (JA 22-23, Compl. ¶¶ 36-38). In light of the Claims Administrators' discretionary control over all aspects of benefits administration (and over plan funds), ERISA, which regulates private employer health plans, imposes fiduciary duties on Claims Administrators to act for the benefit of plan participants. *Id.* The plans benefit from gaining access to Cigna's provider network of "in network" doctors, with whom Cigna directly contracts via an "In-Network Provider Agreement." (JA 23, 59, Compl. ¶¶ 38, 40, 168).

ECAPS, by contrast, as of the filing of the Complaint, had always provided its specialized services to patients as an independent and out-of-network provider, and had never entered into an in-network provider agreement with Cigna or any other Claims Administrator or employer plan. (JA 24, Compl. ¶ 41).

### 3. ECAPS's May 2012 Contract With MPI

In 2012, in an effort to make its specialized services more widely available, ECAPS contracted with MPI to join an MPI Network. (JA 24, 74-90). Under that contract (the "MPI Contract"), ECAPS provides its services to Cigna plan subscribers in exchange for which Cigna (not MPI) is required to pay ECAPS a "Contract Rate," defined as 85% of ECAPS's billed charges less any Co-payments, Deductibles, and Co-insurance, as specified in the patient's plan. (JA 28-29, Compl. ¶ 52; JA 90, MPI Contract at Exhibit D, ¶ 2.1). ECAPS was not required to collect those sums from plan members until ECAPS received an "explanation of benefits from the Client." (JA 32, 79, Compl. ¶ 61 & MPI Contract ¶ 5.4(a)). That requirement makes sense because, as an out-of-network provider, ECAPS has no information on the patient's cost-sharing obligations under her Plan. In practice, it was difficult and at times impossible to obtain accurate co-payment and other patient cost-sharing information from Cigna. The patient's actual cost-sharing obligations and other information reflected in explanations of benefits ("EOB") generated by Cigna were often inaccurate, or knowingly false, such as in the array of instances in which Cigna misrepresented to the patient that Cigna had purportedly obtained a 100% discount from ECAPS and, therefore, the patient had a zero cost-share payment. (JA 32, Compl. ¶ 61).

The MPI Contract specified that MPI had "entered into agreements with Clients" providing them the "right to access" MPI's out-of-network providers (such as ECAPS) and stated that those contracts with Clients "shall be subject to the terms of" the MPI Contract. (JA 78, ¶ 4.3). Thus, via the MPI Contract Cigna could provide its plan subscribers access to MPI's out-of-network providers, who in turn were obliged to deliver healthcare services to plan members despite being outside a plan's network. MPI, in turn, agreed to "require Clients and its Users to use the Contract Rates agreed to in this Agreement." (JA 78, MPI Contract ¶ 4.7; JA 26-29, 34, Compl. ¶¶ 46-53, 68).

Apart from in-network deductibles, co-payments, and co-insurance, if any, as specified in the patient's plan, ECAPS was not permitted to "bill or require any Participant to tender any payment" for services ECAPS provided to the Cigna plan member. (JA 31, Compl. ¶ 59; JA 79, MPI Contract ¶ 5.4(c)). The NSA, an amendment to ERISA, imposed this same prohibition as a matter of federal law effective January 1, 2022 (JA 45-46, Compl. ¶ 106), as explained further below.

To obtain payment for the services it provided to Cigna plan subscribers, ECAPS submitted claims electronically directly to Cigna and, except in cases of timely disputed claims, Cigna was required to pay the claim within 30 days. (JA 30, Compl. ¶ 57; JA 79, MPI Contract ¶ 5.2).

### 4. Cigna's Course Of Underpayments And Nonpayment For ECAPS's Services To Its Plan Members

For most ECAPS claims, Cigna has unilaterally paid ECAPS far less than the 85% Contract Rate, typically as little as 1.8% to 15.5% of the contractually required amounts. (JA 42, Compl. ¶¶ 94-95). Through its many appeals of Cigna's claim denials, ECAPS learned that Cigna would often intentionally apply false, improper, and legally unauthorized "discounts" to ECAPS's claims for treatment of Cigna plan members. (JA 42-43, Compl. ¶ 96). Cigna-issued EOBs suggested that payment to ECAPS was governed by the patient's plan rather than by the MPI Contract. (JA 43, Compl. ¶ 98). These EOBs were inaccurate, however, as ECAPS is an out-of-network provider as to Cigna, and Cigna was "subject to the terms of" the MPI Contract if Cigna offered Participants access to ECAPS's healthcare services via MPI's independent provider Network. (JA 43, 78, Compl. ¶ 99 and MPI Contract ¶ 4.3).

Cigna's scheme of systemically underpaying or paying zero on ECAPS's claims culminated in an April 14, 2023 letter informing ECAPS that, effective immediately, Cigna would pay nothing to ECAPS for its breast reconstruction services to Cigna patients unless ECAPS complied with conditions contained in Cigna-administered plans. (JA 44-45, Compl. ¶ 102; JA 91-94) (the "Payment Disavowal Letter"). Thus, the Payment Disavowal Letter demanded ECAPS's compliance with terms of health plans to which Cigna knew ECAPS was not a party.

(JA 45-46, Compl. ¶¶ 103-107). The Payment Disavowal Letter claimed that "ECAPS does not consistently" bill and collect the "full" amount of the patient's cost-sharing and balance-billing amounts. (JA 45-46, 91, Compl. ¶¶ 103-106, and Exh. 2, at 1). "Balance billing" refers to the practice of billing the patient for the difference between the amount ECAPS bills Cigna and any lesser amount paid by Cigna on behalf of the plan. (JA 45-46, 91, Compl. ¶¶ 103-106, and Exh. 2, at 1). The Payment Disavowal Letter did not acknowledge Cigna's lack of cooperation in ECAPS's effort to collect co-payments. In addition, the Letter failed to acknowledge the fact that beginning in 2022 the NSA expressly barred ECAPS from balance billing patients. (JA 40-41, 45-46, Compl. ¶¶ 89, 106). As noted above, the MPI Contract also prohibited ECAPS from balance billing patients.

As of the filing of the Complaint, Cigna's aggregate underpayments, which began well before the Payment Disavowal Letter, came to several hundred million dollars. (JA 42, Compl.º¶º95).

**5. <u>Cigna Refuses To Pay The Awards ECAPS Obtains Via The NSA's Independent Dispute Resolution Process</u>**

*a.) The NSA's Statutory Arbitration Regime: The Independent Dispute Resolution Process*

The NSA was enacted to "protect consumers from surprise medical bills," which Congress defined to "arise when a consumer covered by a health plan" is treated by an out-of-network provider "and is required to pay the difference between

what the plan pays and the provider's charge." H.R. Rep. No. 116-615 (Dec. 2. 2020), at 47.[1] The statute seeks to achieve this goal by (i) limiting the patient's cost-sharing amount to the in-network amount; (ii) prohibiting balance billing by providers, which "occurs when a patient is held financially liable for the difference between a provider's billed charge and the allowed amount under a health plan;" and (iii) creating an arbitration scheme, referred to as "an Independent Dispute Resolution (IDR) process" "to resolve payment disputes between providers and health plans." *Id*. at 47-48.

The IDR process is one option the NSA creates for determining "the amount that payers must remit" to the out-of-network provider. *Id.* at 56. 29 U.S.C. § 1185e(c)(1)(A) states that to resolve an unpaid or underpaid claim, an out-of-network provider such as ECAPS may initiate negotiations with a Plan. The parties have 30 days to negotiate an agreed payment for the provider's services. If an agreement is not reached, either party may initiate the formal IDR process within four days of the end of negotiations. *See* 29 U.S.C. § 1185e(c)(1)(B).

If a payor or provider invokes the IDR process, the parties then participate in a baseball style arbitration in which both parties submit their proposed payment amount to the IDR entity (*i.e.*, the arbitrator) and the IDR entity chooses one side's

---

[1] This Report is available at https://www.govinfo.gov/content/pkg/CRPT-116hrpt615/pdf/CRPT-116hrpt615-pt1.pdf.

number as the amount the Plan must pay the out-of-network provider. *See* 29 U.S.C. §º1185e(c)(2), (5); (JA 64, Compl. ¶ 183). The NSA states that the IDR entity's determination of the payment amount "shall be binding upon the parties involved," unless the claim is fraudulent or there is evidence of misrepresentation of facts presented to the arbitrator. 29 U.S.C. § 1185e(c)(5)(E)(i)(I). The statute then mandates that the payment required for a service for which an IDR determination is made "shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." 29 U.S.C. § 1185e(c)(6). (JA 64, Compl. ¶ 183).

Finally, the payment amounts in IDR determinations "shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9." 29ºU.S.C. § 1185e(c)(5)(E)(i)(II). (JA 64-65, Compl. ¶ 184). Section 10(a) of title 9 is the provision in the Federal Arbitration Act (FAA) specifying the FAA's four grounds for vacatur of an arbitration award. They are (1) corruption or fraud; (2) partiality or corruption in the arbitrators; (3) arbitrator misconduct; and (4) the arbitrators exceeding their powers. *See* 9 U.S.C. § 10(a).

It is undisputed that ECAPS is a "nonparticipating provider" within the meaning of 29 U.S.C. § 1185e(b)(1), as defined in 29 U.S.C. § 1185e(a)(3)(G)(i), entitled to invoke the IDR process as against the Cigna-administered health plans whose non-payment is at issue in this case.

*b.) ECAPS's IDR Awards And Cigna's Refusal To Pay Any Of Them*

In an effort to obtain payment on some of its submitted claims in the face of Cigna's gross underpayment and non-payment of its claims, ECAPS invoked the IDR process and received IDR awards rendered by the IDR entity. In the aggregate, as of the filing of the Complaint below, through the IDR process ECAPS obtained IDR awards against Cigna-administered plans exceeding $3 million, a sum that has since grown to more than $13 million. Notwithstanding the NSA's mandate that payment of such IDR determinations "shall be made directly to the nonparticipating provider" within 30 days, 29 U.S.C. §º1185e(c)(6), Cigna has never paid any IDR award, or any portion of any IDR award obtained by ECAPS. (JA 65, Compl. ¶ 185).

**6. <u>ECAPS's Complaint And The Claim Asserting Violation Of Its Right To Payment Of Its IDR Awards</u>**

Based on the foregoing facts, ECAPS brought this action against Cigna and MPI. The Complaint asserted claims against Cigna and MPI for breach of contract, and additional claims against Cigna for violations of the NSA and the Connecticut Unfair Trade Practices Act, and sought declaratory and injunctive relief and damages for underpaid and unpaid claims in the multiple hundreds of millions of dollars. (JA 48-73, Compl. at 38-63). As to ECAPS's two NSA claims against Cigna, one asserted violation of the NSA's statutory mandate, set forth in 29 U.S.C. § 1185e(b)(1)(D), that the health plan "shall pay" a nonparticipating provider like

ECAPS a statutorily defined out-of-network rate (Count Seven). (JA 58-63, Compl. ¶¶ 165-178).

The other NSA claim (Count Eight)—the one at issue on this appeal—asserted violation of the statutory mandate that the health plan "shall" pay the provider the amount of any IDR determination within 30 days. (JA 63-65, Compl. ¶¶ 179-186). The cause of action alleged that ECAPS engaged in the IDR process and obtained IDR awards rendered by the IDR entity against Cigna-administered plans in the aggregate amount of more than $3 million. (JA 64-65, (Compl. ¶ 184). The claim further alleged that ECAPS was entitled to be paid the amounts of the IDR determinations, but that "[n]otwithstanding the NSA's mandate that such IDR determinations be paid within 30 days, *see* 29 U.S.C. § 1185e(c)(6)), [Cigna] has failed and refused to pay any portion of" ECAPS's IDR determinations, and that Cigna's failure to pay violated the NSA. (JA 64-65, Compl. ¶¶ 184-86). For relief the cause of action sought a declaratory judgment that Cigna violated its mandatory payment obligations and owes ECAPS the amounts of the IDR determinations, in an amount to be proven but that as of the filing of the Complaint came to at least $3 million, and that is now more than $13 million and growing. (JA 65, Compl. ¶ 186).

Finally, one of ECAPS's patients, whose breast reconstruction Cigna refused to authorize or pay for although it was covered by her plan (JA 66, 68, 70, Compl. ¶

190-91, 202-03, 205), was a second plaintiff and asserted a claim under ERISA against Cigna for breach of fiduciary duty. (JA 66-71, Compl. ¶ 187-209).

### 7. **<u>The District Court Decision</u>**

Cigna and MPI each moved to dismiss the claims against them for failure to state a claim. In an order dated August 14, 2025 (the "Order"), the court granted both motions and dismissed ECAPS's Complaint without prejudice. (JA 135; *see generally* JA 95-135).[2] The court ruled that the NSA and ERISA breach of fiduciary claims failed to state a cause of action and declined to exercise supplemental jurisdiction over ECAPS's state law claims. (JA 122-134).

As to Count Eight seeking enforcement of ECAPS's IDR determinations, the district court concluded that there was "no private right of action under the NSA to enforce IDR awards." (JA 130). The court reasoned that "the NSA provides that an IDR award is automatically 'binding upon the parties involved' and thus '*shall not be subject to judicial review,* except in a case described in any of paragraphs (1) through (4) of section 10(a)' of the Federal Arbitration Act ('FAA')," and "this case does not fall within any of the statutory exceptions." (JA 128) (emphasis in original). The court also placed weight on the limitation on judicial review to conclude that "the

[2] Cigna also sued ECAPS in a separate lawsuit, and the district court accepted the case as related. (JA 106). ECAPS moved to dismiss Cigna's complaint for lack of subject matter jurisdiction and failure to state a claim. (JA 96). The Order also addresses ECAPS's motion to dismiss in that related case, which the district court granted in part and denied in part. (JA 108-122).

statutory text thus forecloses a private right of action to enforce IDR determinations." (JA 130).

The court found persuasive that most other district courts to date (and one appellate court) have declined to infer a private right of action to enforce IDR awards, including *Guardian Flight, L.L.C. v. Health Care Serv. Corp.,* 140 F.4th 271, 275 (5th Cir. 2025) ("*Guardian Flight Fifth Cir.*"), while acknowledging that a Connecticut district court this year has held, to the contrary, that the NSA does afford a private right of action to enforce IDR awards, citing *Guardian Flight LLC v. Aetna Life Insurance Company*, 789 F. Supp.3d 214 (D. Conn. 2025) ("*Guardian Flight D. Conn.*") (JA 128).

Rather than looking to *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001), which provides the framework for evaluating "whether statutes create private rights of action," *see infra* at 25-26, the district court applied *Armstrong v. Exceptional Child Ctr.,* 575 U.S. 320 (2015) (JA 129), which addresses whether a statute "display[s] a[n] intent to foreclose the availability of equitable relief." *Id*. at 329 (brackets in original, cleaned up). On that basis, the court concluded that "the statute supplies an administrative remedy for NSA violations—the IDR process," which the court said was "subject to oversight and enforcement by HHS," citing 29 U.S.C. § 1185e(c)(2). (JA 129). That provision directs the Secretaries of Labor, HHS, and Treasury to

"establish by regulation one independent dispute resolution process." 29 U.S.C. § 1185e(c)(2)(A).

The court therefore concluded that, "to the extent ECAPS seeks a declaration under the NSA itself, ECAPS has not, for the reasons above, shown that there is a private right of action under the NSA." (JA 130). The court also ruled that ECAPS's claim "that Cigna violated the NSA is also not viable," evidently referring to ECAPS's claim in Count 7 that Cigna violated the NSA by refusing to comply with the statutory "shall pay" mandate, on the ground that the Declaratory Judgment Act "does not provide an independent cause of action." (JA 130).

The district court entered judgment dismissing ECAPS's Complaint, specifying, as provided in the Order, that the dismissal was without prejudice. (JA 136). ECAPS timely appealed. (JA 137-38).

## SUMMARY OF THE ARGUMENT

The district court erred in ruling that the NSA prohibits out-of-network providers like ECAPS from enforcing IDR determinations. The statutory text, structure, and context reflect Congress's intent to imply a private remedy to effectuate its statutory mandate that group health plans "shall" pay providers their "binding" IDR awards within 30 days. Without a private remedy the IDR award, and the entire statutory process behind it, is rendered meaningless since the statute does not provide any other mechanism for compelling group health plans to pay the providers' IDR awards.

In enacting the NSA Congress created a trade off: out-of-network providers are prohibited from billing their patients for out-of-network amounts beyond what the patient would pay if the medical service was performed by an in-network doctor. In exchange, the NSA mandates that plans and insurers "shall pay" the providers the applicable out-of-network amount. The statute creates the IDR process as one method for determining that applicable out-of-network amount.

Congress's intent to imply a private remedy is reflected in the language it chose. First, in mandating that group health plans "shall" make payment "directly to the nonparticipating provider," Congress chose strong rights-creating language and expressly specified the provider as the direct beneficiary of the payment mandate. In addition, Congress made IDR awards "binding" and not "subject to judicial review"

except in the narrow certain circumstances described in Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a). An award that is "binding" is understood to be ripe for judicial enforcement, while the limitation on judicial review conveys that the payment amounts in IDR awards may not be set aside except on the narrow grounds specified in the FAA. This structure mirrors that of the FAA: Section 9 provides for enforcement of awards that result from arbitration agreements while Section 10 specifies the narrow grounds for setting them aside.

The absence of an administrative enforcement scheme to collect unpaid IDR awards bolsters the conclusion that Congress intended to provide for private enforcement of IDR awards. The district court pointed to a provision directing the Secretaries of Labor, HHS, and Treasury to establish the IDR process as authorizing administrative enforcement, but the statutory directive to establish a process does not empower any agency to compel any group health plans to pay overdue IDR awards. The penalty provision identified by the Fifth Circuit, *see* 140 F.4th at 275, likewise does not authorize HHS or any other agency to compel payment of overdue IDR awards from group health plans; as described below, the penalty provision limits HHS enforcement to violations that are inapplicable here.

In addition, the district court's interpretation renders meaningless the entire IDR statutory regime that Congress established. If group health plans, and their claims-administration agents like Cigna, are allowed to ignore the NSA's mandate

that they "shall pay" a "binding" IDR award "directly" to an out-of-network provider within 30 days—and if they can never be compelled by courts to comply with their statutory obligations—then those statutory requirements are mere surplusage and without any legal effect.

This Court should reverse the district court's judgment to the extent it dismissed ECAPS's cause of action seeking to enforce the IDR determinations it obtained against Cigna for the services at issue in each IDR case.

## STANDARD OF REVIEW

This Court reviews "review[s] *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Collins v. Putt*, 979 F.3d 128, 132 (2d Cir. 2020) (quoting *Dolan v. Connolly*, 794 F.3d 290, 293 (2d Cir. 2015)).

# ARGUMENT

## I. THE NSA AFFORDS PROVIDERS A PRIVATE RIGHT OF ACTION TO ENFORCE THEIR INDEPENDENT DISPUTE RESOLUTION AWARDS

The district court erred in granting Cigna's motion to dismiss ECAPS's eighth cause of action seeking payment of the IDR awards it obtained pursuant to the NSA's IDR process. The statute's text, structure, and context, and the absence of any other mechanism to compel group health plans to pay providers' IDR awards, reflect Congress's intent to afford providers a private remedy to enforce their awards.

### A. Legal Standards – Private Right of Action

"A federal statute may create a private right of action either expressly or…by implication." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014). "In determining whether Congress has created a private right of action, 'the interpretive inquiry begins with the text and structure of the statute[.]'" *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 104 (2d Cir. 2019) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288 n.7 (2001)). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. "Statutory intent on this latter point is determinative." *Id.*

To conduct the required analysis, the court first "consider[s] whether the statute uses 'rights-creating language,' meaning language that 'focus[es] on . . . the

individuals protected' rather than 'the person regulated.'" *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1112 (2d Cir. 2024) (quoting *Sandoval*, 532 U.S. at 289). A mandate that one entity "shall pay" another entity, for example, is rights-creating language that focuses on the person protected, as the Supreme Court held in *Maine Community Health Options v. United States*, 590 U.S. 296, 301 (2020) ("shall pay" mandate in Patient Protection and Affordable Care Act "established a money-mandating obligation" and private right of action to sue for damages); *cf. Sandoval*, 532 U.S. at 288 (Title VI mandate that "no person . . . shall be subjected to discrimination" is "rights-creating language . . . critical to the Court's analysis in *Cannon [v. University of Chicago*, 441 U.S. 677 (1979)]" that statute implied private right of action).

The court then examines "whether the statute's methods of enforcement manifest an intent to create a private remedy, as opposed to empowering agencies to enforce their regulations." *Murphy Med. Assocs.,* 120 F. 4th at 1112 (quoting *Sandoval*, 532 U.S. at 289). "[C]ourts have recognized that a private right of action may be implied if there are no enforcement mechanisms or express remedies available, such that without an implied private cause of action, plaintiffs would have no remedy to the legislatively recognized harm." *Guardian Flight D. Conn.*, 789 F. Supp.3d at 228.

## B. The NSA's Text And Structure Reflect Congress's Intent To Create A Private Remedy For Out-Of-Network Providers Like ECAPS

The text and structure of the NSA reflect Congress's intent to create a private remedy allowing out-of-network providers like ECAPS to enforce their IDR awards.

### 1. The NSA Replaces The Patient's Obligation To Pay The Provider With The Group Health Plan's Obligation To Pay The Provider

As explained above, to protect patients from surprise medical bills, the NSA "aims to cap the patient's share of liability to [certain] out-of-network providers at an amount comparable to what the patient would have owed had the patient received care from an in-network provider." *Guardian Flight D. Conn.*, 789 F. Supp.3d at 220-21. Thus, neither the patient's group health plan nor her doctor may bill the patient for a payment amount "that is greater than the cost-sharing requirement that would apply" under the plan if the health care services had been furnished by an "in-network provider" with a direct contractual relationship with the plan. 29 U.S.C. § 1185e(b)(1)(A) (provision barring health plan); 42 U.S.C. § 300gg-132(a) (provision barring provider, which "shall not bill, and shall not hold liable" plan enrollee for a payment amount that is more than the cost-sharing requirement required with in-network provider). For example, if the medical bill is $10,000 and the patient's in-network cost-sharing requirement is $500, neither the health plan nor the provider may collect the remaining $9,500 from the patient.

Instead, the NSA requires the group health plan to pay the provider. The Act mandates that when a nonparticipating provider such as ECAPS delivers non-emergency medical services to a patient at a "participating facility" for which "any benefits are provided or covered by a group health plan," then the group health plan "*shall pay* a total plan. . . payment directly" to such nonparticipating provider "equal to the amount by which the out-of-network rate" for such health care "services exceeds the cost-sharing amount imposed under the plan." 29 U.S.C. § 1185e(b)(1)(D). The "out of network rate" is defined as an amount either "agreed upon" by the plan and the provider (whether previously "agreed upon" or later-agreed through open negotiations during the IDR process), or the amount determined in an IDR award itself. *See* 29 U.S.C. § 1185e(b)(1)(D) (health plan "shall pay a total plan or coverage payment directly . . . to such provider . . . equal to the out-of-network rate as defined in subsection (a)(3)(K)," which in turn states, in (K)(ii)(II), that in IDR cases the amount of the IDR entity's determination is the "out-of-network rate"); 42 U.S.C. § 300gg-111(b)(1)(D) (same).

If the parties receive a determination from the IDR entity to establish the "out of network rate," the payment required under the "shall pay" mandate in 29 U.S.C. § 1185e(b)(1)(D) "shall be made directly to the nonparticipating provider" within 30 days of the date the determination was made. 29 U.S.C. § 1185e(c)(6).

The statute's shifting of the obligation to pay from the patient to the health plan is integral to "'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. No. 116-615, Part 1, at 55. Once the consumer is out of the middle, any payment dispute is instead between the group health plan as a third-party payor and the out-of-network medical provider. Congress recognized that in that dispute, a "key element of any solution to address surprise billing comprehensively is the payment rate, which is the amount *that payers must remit to providers* for out-of-network items and services." *Id*. at 56 (emphasis added). In short, in the trade off to shield consumers from costs charged by out-of-network providers, Congress mandated that the providers would be paid directly by the health plans.

2. The NSA's Use Of Rights-Creating Language Carries A Remedy To Give Effect To The Providers' Statutory Right To Be Paid By Group Health Plans

Read in the context of the statutory structure—*i.e.*, the legislative prohibition on providers billing patients coupled with providers' entitlement to be paid by the group health plans—the language Congress used in ordering plans to pay the IDR awards reflects Congress's intent to afford providers a private remedy. The statute employes strong "rights creating language" while also focusing on the "individuals protected" by the payment mandates. *Sandoval*, 532 U.S. at 289.

As explained above, the NSA contains mandatory, "shall pay" language whether the "out of network rate" is determined between the group health plan and

the provider by prior agreement, through open negotiation in the first phase of the IDR process, or by the amount of an IDR award:

> In the case of items or services . . . for which any benefits are provided or covered by a group health plan or health insurance issuer offering group health insurance coverage furnished to a participant or beneficiary of such plan or coverage by a nonparticipating provider . . . the plan or coverage, respectively—
>
> * * *
>
> (D) *shall pay a total plan or coverage payment directly*, in accordance, if applicable, with the timing requirement described in subsection (c)(6) [30 days], *to such provider* furnishing such . . . services to such participant or beneficiary that is . . . equal to the amount by which the out-of-network rate . . . for such items and services exceeds the cost-sharing amount imposed under the plan or coverage. . . .

29 U.S.C. § 1185e(b)(1)(D) (emphases added).

When the amount of the payment is determined via an IDR award, moreover, the payment "shall be made directly to the nonparticipating provider . . . not later than 30 days after" the IDR determination. 29 U.S.C. § 1185e(c)(6).

In *Maine Community Health Options v. United States*, 590 U.S. 296 (2020), the Supreme Court held that an analogous "shall pay" mandate in the Patient Protection and Affordable Care Act "established a money-mandating obligation" and a private right of action to sue for damages. *Id.* at 301. The statute at issue specified that the Secretary of the Department of Health and Human Services "shall pay" eligible participating plans that were unprofitable. When the government did not pay the unprofitable plans, the plans sued. The Court explained that "[s]tatutory 'shall

pay' language often reflects congressional intent 'to create both a right and a remedy.'" *Id.* at 324 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 906 n.42 (1988)).

While *Maine Community Health* involved the Tucker Act, the Court made a point of noting, citing *Sandoval*, that the principal is a general one: "if a statutory obligation to pay money is mandatory, then the congressionally conferred right to receive money . . . will typically display an intent to provide a damages remedy for the defaulted amount." *Maine Community Health,* 590 U.S. at 323 n.12. Even before *Maine Community Health* the Supreme Court recognized that "'to say that A shall be liable to B is the express creation of a right of action.'" *Key Tronic Corp. v. United States*, 511 U.S. 809, 818 n.11 (1994) (quoting as "correct" *id.* at 822 (Scalia, J., dissenting)); *see also Bowen*, 487 U.S. at 923 (a "statute commanding the payment of a specified amount of money…impliedly authorizes (absent other indication) a claim for damages in the defaulted amount") (Scalia, J., dissenting). The Court explained that it has "repeatedly rejected" the "dissent's logic" that "a federal statute could never provide a cause of action for damages absent magic words explicitly inviting suit." *Maine Community Health,* 590 U.S. at 323 n.12.

In addition to the "shall pay" language, the mandate that the health plan make payment of the IDR determination "directly to the nonparticipating provider" within 30 days focuses on the "individuals protected" by the payment mandate—the

providers. *Sandoval*, 532 U.S. at 289. The short 30-day statutory payment deadline itself reinforces the intent to benefit the provider, since it is a deadline the HHS Secretary may not alter. 29 U.S.C. § 1185e(c)(9) (prohibiting Secretary from modifying the 30-day payment deadline).

The First Circuit held an analogous statutory provision privately enforceable in *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74 (1st Cir. 2005). The question was whether a federally qualified health center (FQHC) had a private remedy for the Health Secretary of Puerto Rico's violation of a statutory obligation to make certain "wraparound" payments under a provision of the Medicaid statute providing as follows:

> **(A) In general**
>
> In the case of services furnished by a [FQHC] ... pursuant to a contract between the center or clinic and a managed care entity ..., *the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under [the earlier paragraphs describing the PPS payment system] of this subsection exceeds the amount of the payments provided under the contract*.
>
> **(B) Payment schedule**
>
> The supplemental payment required under subparagraph (A) *shall be made pursuant to a payment schedule agreed to by the State and the [FQHC] ..., but in no case less frequently than every 4 months*.

*Id*. at 74 (emphasis added). The court held that the "shall provide for payment to the center" language "is rights-creating language because it is mandatory and has a clear

focus on the benefitted FQHCs." *Id.* at 74. On the latter point, by providing for payment to the FQHCs, the "provision mentions a specific discrete beneficiary group within the statutory text." *Id.* And the statute is "extremely clear and narrow: it tells a state exactly how to calculate the wraparound and it gives a maximum duration (4 months) between wraparound payments." *Id.* at 75. Accordingly, the court determined that a private action under 42 U.S.C § 1983 could be brought by a FQHC to enforce the Secretary's payment obligation. *See id.*

These same attributes compel the same conclusion for the NSA provisions mandating payment of IDR awards. The "payment shall be made" language is mandatory; the provision identifies a discrete group that is to receive the mandated payments, *i.e.*, the providers; the text imposes a clear and specific payment obligation and specifies a deadline for payment of 30 days. There should be no doubt that under the *Sandoval* analysis the NSA affords providers a private remedy to enforce IDR determinations.

3. By Making IDR Determinations "Binding" Congress Made Them Judicially Enforceable

As explained above, the NSA states, in a section entitled "[e]ffects of determination," that an IDR determination "shall be binding upon the parties involved" absent a fraudulent claim or misrepresentation of facts about the claim presented to the arbitrator. 29 U.S.C. § 1185e(c)(5)(E)(i)(I). Congress's vesting of

IDR determinations with "binding" effect is another indication of its intent to render them judicially enforceable by providers.

An arbitration award that is "binding" is understood in other statutory contexts to mean it is amenable to judicial enforcement. That is the case, for example, under the Labor Management Relations Act. *See Gen. Drivers, Warehousemen & Helpers, Loc. Union No. 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963) ("If, as petitioners allege, the award of the Joint Area Cartage Committee is under the collective bargaining agreement final and binding, the District Court has jurisdiction under s 301 [of the Labor Management Relations Act] to enforce it, notwithstanding our Westinghouse decision."); *Porter v. Thompson Roofing & Sheet Metal Co.*, 242 F.3d 367 (2d Cir. 2000) ("An award may not be enforced [under the LMRA] unless it is 'final and binding' under the governing collective bargaining agreement."). The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the New York Convention), which is "incorporated into American law at 9 U.S.C. § 201 et seq.," excepts from judicial enforcement "awards that have not yet become binding on the parties." *Publicis Commc'n v. True N. Commc'ns, Inc.*, 206 F.3d 725, 728 (7th Cir. 2000). Once binding, in other words, the awards are judicially enforceable.

"Binding" arbitration is likewise understood to mean the ensuing award is enforceable in court. *See Qorvis Commc'ns, LLC v. Wilson*, 549 F.3d 303, 309 (4th Cir. 2008) ("[t]he core question" bearing on whether judicial enforcement is

authorized "is whether the parties agreed to arbitration as a binding process"); *Lander Co. v. MMP Invs., Inc.*, 107 F.3d 476, 480 (7th Cir. 1997) ("To agree to binding arbitration is to agree that if your opponent wins the arbitration he can obtain judicial relief if you refuse to comply with the arbitrator's award."); *Int'l Molders & Allied Workers Union, Loc. No. 164 v. N.L.R.B.*, 765 F.2d 858, 860 (9th Cir. 1985) ("The arbitration clause does state that '[t]he decision of the arbitrator shall be final and binding upon' the union and Pacific Steel. But neither this nor any other language of the arbitration clause necessarily evidences an agreement that judicial enforcement is not part of the arbitration process . . . ."). Prohibiting enforcement of a "binding" award is to read the word out of the statute.

In short, Congress used the term "binding" because the term is "understood to mean that an award will be enforceable in court." *Cheminova A/S v. Griffin L.L.C.*, 182 F. Supp. 2d 68, 73 (D.D.C. 2002) (provision in Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) allowing for either party to compensation scheme to "initiate '*binding* arbitration proceedings'" reflected Congress's intent to permit judicial enforcement of arbitration panel decisions) (emphasis in original). As the Court there explained, use of a term that in arbitration agreements "is tantamount to consent to judicial enforcement" "should not convey a different meaning" when used in FIFRA's statutory arbitration scheme. *Id*. at 74; *see also Kallen v. Dist. 1199, Nat. Union of Hosp. & Health Care Emp.*, 574 F.2d 723, 726 (2d Cir. 1978) (employer

must have understood that participating in arbitration in which arbitrator's award was "final, conclusive, and binding" under collective bargaining agreement meant "that federal court intervention may be sought to compel compliance").

4. Congress Did Not Provide For Administrative Enforcement To Collect Unpaid IDR Determinations

Finally, the absence of an administrative enforcement scheme also reflects Congress's expectation that providers would be able to judicially enforce their IDR determinations.

The NSA does not authorize HHS to collect IDR awards or otherwise allow the agency to force group health plans to pay the award. Section 1185e(c)(2)(A) directs agencies to *establish* an IDR process. Sections 300gg-111(c)(4) and 1185e(c)(4) direct the Secretaries of Labor, HHS, and Treasury to "establish a process to certify" qualified IDR entities (i.e., arbitrators). This provision "does not empower the Secretary to enforce IDR awards or adjudicate payment disputes. Nor does it create any mechanisms by which providers . . . could report noncompliant plans and insurers." *Guardian Flight D. Conn*, 789 F. Supp.3d at 229. Section 1185e(c)(5)(E)(iv) directs the agencies to report to Congress on abusive practices by plans or insurers. In its amicus brief before the Fifth Circuit, the United States disclaimed that the NSA contains any adequate alternative means to compel plans to pay what they owe, explaining that "no such alternative enforcement" to a private remedy exists in the statute. October 4, 2024, Amicus Brief of the United States, in

*Guardian Flight Fifth Circuit*, Fifth Circuit Case No. 24-10561, Dkt. No. 32, at 13-14.

*a.) The Provisions Cited By The District Court Do Not Allow For HHS Enforcement Of IDR Determinations*

The district court cited 29 U.S.C. § 1185e(c)(2) for the proposition that the statute "delegates authority over the IDR process to the HHS Secretary," to conclude that Congress opted for HHS "oversight and enforcement" in lieu of a private remedy. (JA 129). But that is not at all what the cited provision says or implies. As explained above, 29 U.S.C. § 1185e(c)(2) instructs the Secretaries of Labor, HHS, and Treasury to "establish by regulation one independent dispute resolution process" under which a certified IDR entity determines the amount payment under the plan for the services furnished. Consistent with the statute's plain terms, and as confirmed by the United States in its amicus brief, nothing in this paragraph or elsewhere authorizes HHS to handle enforcement of IDR awards.[3]

The district court's characterization of the IDR process itself as "an administrative remedy for NSA violations" is also untethered from the ordinary meaning of that term. Black's Law Dictionary defines "administrative remedy" as "a nonjudicial remedy provided by an administrative agency." REMEDY, Black's Law

[3] The district court's references to factual materials on the Internet to suggest that "HHS assumed authority over the IDR enforcement process" (JA 129) cannot override the statute itself, nor may factual materials not mentioned in the Complaint be used against ECAPS on a motion to dismiss.

Dictionary (12th ed. 2024). Plainly the arbitration process created by the NSA, under which determination of the payment amount in each case is made by a private party jointly selected by the provider and the health plan, *see* 29 U.S.C. § 1185e(c)(4)(F)(i), is an *alternative* to an administrative adjudication process carried out by an agency.

*b.) The Civil Penalty Provisions Of The Public Health Service Act Do Not Authorize HHS Enforcement For Failure To Pay IDR Awards*

Finally, the civil penalty provisions of the Public Health Service Act, 42 U.S.C. § 300gg-22(b)(2)(A), also do not reflect Congress's intent to bar private enforcement of IDR determination, as these provisions authorize HHS to act, in the absence of state enforcement, against violations of provisions relating to health insurance transactions, not relating to non-payment of IDR awards.

42 U.S.C. § 300gg-22(b), entitled "Secretarial enforcement authority," sets forth in paragraph (1) the "Limitation" on the Secretary's authority. It states in relevant part that "The provisions of this subsection shall apply to enforcement of a provision (or provisions) of this part or part D [the NSA] only—(A) as provided under subsection (a)(2)." 42 U.S.C. § 300gg-22(b)(1)(A). Subsection (a)(2), in turn, provides for the Secretary's enforcement, in the absence of appropriate state enforcement, for violations relating only to the issuance, sale, renewal, and offering of health insurance:

(2) Failure to implement provisions

> In the case of a determination by the Secretary [of HHS] that a State has failed to substantially enforce a provision (or provisions) in this part or part D [the NSA] with respect to health insurance issuers in the State, the Secretary shall enforce such provision (or provisions) under subsection (b) **insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage** in connection with group health plans or individual health insurance coverage in such State.

42 U.S.C. § 300gg-22(a)(2) (emphasis added). For "cases described in paragraph (1)," *i.e.*, the paragraph entitled "Limitations," health plans and insurers are subject to a civil monetary penalty. 42 U.S.C. § 300gg-22(b)(2)(A). The provision's authorization of HHS enforcement "insofar as" the violated provisions "relate to the "issuance, sale, renewal, and offering of health insurance coverage" says nothing about HHS's enforcement of unpaid IDR awards. The qualifications on the authorized penalties, furthermore, would be nonsensical as applied to plans' failures to pay IDR awards. Penalties do not apply, for example, if none of the penalized entities "knew, or exercising reasonable diligence would have known, that such failure existed;" or if "such failure was due to reasonable cause and not to willful neglect." 42 U.S.C. § 300gg-22(b)(2)(C)(iii).

## C. The Fifth Circuit's Superficial Reading Of Selective IDR Provisions Is Not Persuasive

### 1. The Fifth Circuit Relied On The Penalty Provision While Ignoring Its Express Limitation On HHS's Enforcement Authority To "Health Insurance Coverage" Transactions

Accordingly, the Fifth Circuit's reliance on the statute's supposed administrative remedies to indicate a lack of congressional intent to allow for private enforcement is equally unpersuasive. The supposed administrative remedies relied on by the Fifth Circuit are the foregoing penalty provisions of the Public Health Service Act. *See Guardian Flight Fifth Cir.*, 140 F.4th at 277 (citing 42 U.S.C. § 300gg-22(b)(2)(A)). But as shown in detail immediately above, the Court's superficial reference to this statute failed to account for its actual contents, which limits HHS enforcement authority to situations in which states have failed to act in areas of state-governed insurance regulation: as shown above, HHS is empowered to impose penalties only if it determines that a State has failed to enforce provisions of the NSA "*insofar as they relate to* the issuance, sale, renewal, and offering of health insurance coverage" in the state. 42 U.S.C. § 300gg-22(a)(2); 42 U.S.C. § 300gg-22(b)(1) (expressly stating that "Secretarial enforcement authority" is limited to enforcement "as provided under subsection (a)(2)").

Thus, HHS's enforcement authority does not extend to "assess[ing] penalties against insurers" for failure to pay IDR determinations. *Guardian Flight Fifth Cir.*, 140 F.4th at 277.

By contrast, the Connecticut district court correctly recognized that the statutory provisions providing for an HHS role in establishing (i) "a methodology for" certain payment amounts and an audit process, and (ii) a process to certify IDR entities "do not empower agencies to enforce individual IDR awards or to hold health plans and insurers accountable for untimely payments." *Guardian Flight D. Conn.*, 789 F. Supp.3d at 229. Indeed, the defendants in that case, which include Cigna, did not even invoke the unrelated penalty provision relied on by the Fifth Circuit in arguing that the HHS statutory role reflects Congress's intent to foreclose a private remedy. *See id.*

2. <u>The Fifth Circuit Cherry Picked A Term To Interpret That Congress Did Not Use While Ignoring The Actual Language And Structure Of The IDR Regime</u>

The other rationale relied on by the Fifth Circuit is equally misguided. Both it and the court below relied on the NSA's prohibition on "judicial review except in a case described in paragraphs (1) through (4) of section 10(a)" of the FAA, which, again, set forth the narrow grounds (e.g., fraud, corruption, and arbitrator misconduct) for vacating an arbitration award. 29 U.S.C. §°1185e(c)(5)(E)(i)(II). Both the Fifth Circuit and the lower court reasoned that the prohibition on "judicial review" encompasses a prohibition on judicial *enforcement*. The Fifth Circuit deemed judicial review versus judicial enforcement "a distinction without a difference." *Guardian Flight Fifth Cir.*, 140 F.4th at 275. The district court believed the bar on

"judicial review" to so self-evidently bar a private remedy to enforce unpaid awards that it did not offer any reasoning beyond simply citing the statutory prohibition. (JA 129-30).

There are multiple problems with this conclusion. First, at the textual level, a right to "judicial review" of an award is not the same as a right to enforce an award. The Fifth Circuit cited Black's Law Dictionary for the meaning of "review," *Guardian Flight Fifth Cir.*, 140 F.4th at 275. But the court did not see fit to investigate the language Congress actually used, namely, "judicial review," a term of art meaning, according to Black's Law Dictionary, "A court's power to review the actions of other branches or levels of government; esp., the courts' power to invalidate legislative and executive actions as being unconstitutional;" the "constitutional doctrine providing for this power;" and "A court's review of a lower court's or an administrative body's factual or legal findings." JUDICIAL REVIEW, Black's Law Dictionary (12th ed. 2024).

The concept at the heart of the term Congress chose, "judicial review"—the power to *invalidate* an action—contrasts with Black's definition of enforcement, another definition the Fifth Circuit did not see fit to consider in concluding that "enforcement" versus "judicial review" is a distinction without a difference. According to Black's, to "enforce" means: "1. To give force or effect to (a law, etc.); to compel obedience to;" and "2. Loosely, to compel a person to pay damages for not

complying with (a contract)." ENFORCE, Black's Law Dictionary (12th ed. 2024). Thus, while the exercise of judicial review may lead to invalidation of the act under review, enforcement requires obedience to the act. In barring judicial review except in cases specified in section 10 of the FAA, the statute bars a court from invalidating an IDR except in those narrow circumstances. Barring "judicial review" does not bar exercise of the opposite power, namely, the power to enforce obedience to the award.

Congress demonstrated its understanding elsewhere in the NSA that "judicial review" refers to the exercise of invalidating, not enforcing. In the section providing for penalties against group health plans, Congress established a right of "Judicial Review" in favor of "any entity against whom an order imposing a civil money penalty has been entered." 42 U.S.C. § 300gg-22(E)(i). In that provision Congress established that the "findings of the Secretary shall be set aside only if found to be unsupported by substantial evidence," 42 U.S.C. § 300gg-22(E)(iii)—making clear that it understood "judicial review" to mean the authority to "set aside" a determination. "[I]dentical words and phrases within the same statute should normally be given the same meaning." *Monsalvo Velazquez v. Bondi*, 604 U.S. 712, 726 (2025); *see also Gorss Motels, Inc. v. Lands' End, Inc.*, 997 F.3d 470, 478 (2d Cir. 2021) ("[W]hen Congress uses the same words in two different portions of the same statute, we presume that they have the same meaning in both"). Thus, when Congress used the term "judicial review" to mean a proceeding limited to determining

whether a penalty should be *set aside*, the limitation on "judicial review" Congress imposed for IDR determinations cannot be interpreted to mean a limitation on anything other than a proceeding to set aside an award.

Second, the statutory structure reinforces the meaning of the language Congress chose. Under "Effects" of an IDR determination, the statute states in two consecutive paragraphs that first, the award "shall be binding," that is, ripe for enforcement as shown above, and second it "shall not be subject to judicial review," *i.e.*, to invalidation except on the narrow grounds described in the FAA as grounds for vacatur of an award. 29 U.S.C. § 1185e(c)(5)(E)(i). Unlike the Fifth Circuit, the Connecticut district court gave effect to the language and structure of these provisions in concluding that the statute allows for private enforcement. *See Guardian Flight D. Conn.*, 789 F. Supp.3d at 228 (use of word "binding" and placement of the two provisions together to define "Effects" of award reflects Congress's intent that judiciary would ensure binding nature of awards and "clarify that courts should not undermine the substance or finality of these awards"). Indeed, this structure parallels that of sections 9 and 10 of the FAA—awards are "binding," and thus enforceable (FAA section 9), unless subject to vacatur upon judicial review (FAA section 10). As the *Cheminova A/S* court explained in interpreting FIFRA, the "Court must assume that, absent a plain indication to the contrary, Congress intended the [NSA's

IDR] arbitration scheme to fit within existing arbitration law." *Cheminova A/S*, 182 F. Supp. at 74.

Other courts have also found these terms and structure significant in concluding the statute affords a private right of action. *See GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821, at *3 (D.N.J. Sept. 8, 2023) (denying provider's motion to vacate IDR award, and granting insurer's motion to confirm award, because IDR determination is binding "and "only subject to judicial review under" FAA § 10(a)); *Worldwide Aircraft Servs. Inc. v. Worldwide Ins. Servs. LLC*, 2024 WL 4226799, at *4 (M.D. Fla. Sept. 18, 2024) (confirming IDR award subject only to exceptions in FAA § 10(a)). The *GPS of N.J.* court continued that the NSA's "language indicates the decision is to be 'final and binding,' and gives the court the authority to confirm the award." 2023 WL 5815821, at *10.

The Fifth's Circuit's reliance on Congress's failure to incorporate section 9 of the FAA is also unpersuasive. Section 9 of the FAA specifies the process for confirming an award resulting from an arbitration agreement. *See* 9 U.S.C. §º9 ("If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration . . . ."). The IDR awards do not ensue from an agreement to arbitrate but from the NSA's statutory provisions. Congress understood that by its plain terms Section 9 of the FAA would be inapplicable to IDR determinations.

### 3. Denying A Private Enforcement Remedy Renders Meaningless The Entire IDR Statutory Regime

Finally, the district court's and Fifth Circuit's interpretation to bar private enforcement of IDR awards guts and renders meaningless the entirety of the statutory IDR regime. Though the statute creates a specific process to which doctors, insurance companies, health plans, plan fiduciaries, and arbitrators devote extensive time, the expenditure of time is for no reason since it does not lead to providers being paid, as Congress mandated, if the health plan doesn't feel like paying. In *Maine Community Health*, the Supreme Court emphasized that its interpretation of the Affordable Care Act provision's "shall pay" mandate to create a private right of action prevented the statute's "mandatory statutory obligation to pay" from being rendered "meaningless." 590 U.S. at 323 n.12.

The absence of a private remedy also would render the incorporation of section 10 of the FAA superfluous and absurd: since no plan or insurer can be compelled to pay an IDR award under the district court's and Fifth's Circuit's interpretation, what is the purpose of providing grounds for setting aside an award? Under this regime, "the awards would be enforceable *only if* they were challenged on one of the narrow grounds in § 10(a) of the FAA *and then only if* the Court found that the challenge lacked merit." *Guardian Flight D. Conn.*, 789 F. Supp.3d at 228 (emphasis in original). It is fanciful to think an insurer or health plan would spend time and money to challenge an award to begin with when they can simply opt not to pay the award

knowing the provider has no means to compel the payment. As the Connecticut district court recognized, a statutory interpretation "that leads to absurd results is an erroneous interpretation." *Id*. (citing *United States v. Granderson*, 511 U.S. 39, 47 n.5 (1994)); *see also, e.g.*, *Troll Co. v. Uneeda Doll Co*., 483 F.3d 150, 160 (2d Cir. 2007) ("[W]e must interpret the statute to avoid such an absurd result.").

## II. IF THE LOWER COURT'S ADDITIONAL DECLARATORY JUDGMENT RULING APPLIES TO THE IDR CAUSE OF ACTION IT IS WRONG AND IS NOT A PROPER BASIS FOR DISMISSAL

The district court ruled that it was rejecting ECAPS's cause of action seeking a declaration entitling it to payment of the IDR determinations (Count 8) because "ECAPS has not, for the reasons above, shown that there is a private right of action under the NSA." (JA 130). One sentence earlier, the court said that ECAPS's "request for a declaration that Cigna violated the NSA is also not viable" because the Declaratory Judgment Act ("DJA") "does not provide an independent cause of action." (*Id*.) The natural reading of the two sentences together is that the "not viable" ruling refers to ECAPS's claim that Cigna violated the NSA's statutory "shall pay" mandate (Count 7) by failing to pay ECAPS's statutorily specified "out-of-network rate," which the Complaint alleged was the Contract Rate defined in the MPI Contract. (JA 59-61; *see also* cause of action at JA 58-63).

This appeal does not challenge the dismissal of Count 7. However, to the extent this Court believes there is ambiguity in whether the "not viable" ruling applies to ECAPS's cause of action seeking payment of the IDR awards (Count 8), it would be error to accept a ruling that Count 8 fails to state a claim based on the lower court's rationale that the DJA does not provide an independent cause of action.

### A. Count 8 Does Not Fail To State A Claim Simply Because It Seeks A Declaratory Judgment Remedy Together With The Pleading Of An Underlying Substantive Claim Seeking Payment Of ECAPS's IDR Awards

For the proposition that the DJA does not provide an independent cause of action, the district court cited *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993), and *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012). In each of these cases, however, the party seeking declaratory relief failed to allege a substantive entitlement to relief, in contrast to ECAPS's cause of action seeking payment of its IDR awards. In *In re Joint E. & S. Dist. Asbestos Litig.*, plaintiff Keene Corporation ("Keene") sought a declaratory judgment that res judicata would apply to bar its future liability if Keene were to enter a settlement it hoped to reach with the defendant class of claimants. *Id.* 731-32. The Court rejected the argument, explaining that Keene did not allege that defendants were "legally harming, or will legally harm, Keene by refusing to settle their asbestos claims…There is thus no claim that, if settlement negotiations fail, Keene will be able to prove facts at trial that would entitle it to relief." *Id.* at 731.

*Chevron*, which does not address the sufficiency of allegations at the pleading stage, concerned whether the district court had properly granted Chevron a preliminary injunction, under New York's Uniform Foreign Country Money-Judgments Recognition Act (the "Recognition Act"), against global enforcement of an Ecuadorian judgment before the judgment-creditor sought enforcement. *Id.* at

234. The Second Circuit concluded that the Recognition Act did not provide for a substantive right to declare the Ecuadorian judgment non-recognizable, or enjoin its enforcement, before the judgment creditor attempted to enforce the judgment in New York. *Id.* at 244. The decision makes the familiar point that the DJA "cannot create legal rights" and thus could not be used to seek relief that is legally unavailable under the Recognition Act. *Id*. at 244-45.

These cases do not support dismissal of ECAPS's cause of action seeking to compel payment of its IDR awards. In contrast to the seekers of declaratory relief in *In re Joint E. & S. Dist. Asbestos Litig.* and *Chevron*, ECAPS has a substantive claim it can prove at trial (whether or not a private right of action exists, as explained below)—namely: (i) the NSA mandates that payment by health plans "shall be made" to the provider, *i.e.*, ECAPS, within 30 days of the IDR determination; (ii) ECAPS obtained IDR awards in its favor against Cigna; and (iii) Cigna has failed to pay the awards or any portion of them. (JA 63-65). Accordingly, the Complaint (Count 8) asserts a substantive violation that is not dependent on the DJA for its viability.

In these circumstances, the underlying substantive claim cannot be dismissed on the pleadings on the ground that it seeks or is styled as a claim for declaratory judgment. For example, in *In re GEICO Customer Data Breach Litig.*, 691 F. Supp.3d 624, 634 (E.D.N.Y. 2023), the court denied Geico's motion to dismiss plaintiffs' claims for violation of the Driver's Privacy Protection Act and negligence

and, accordingly, denied Geico's motion to dismiss plaintiffs' declaratory judgment claim based on those claims. Similarly, in *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 606 (S.D.N.Y. 2022), the plaintiffs could seek a declaratory judgment against the defendant Mediant Communications, Inc. ("Mediant") because plaintiffs had plausibly pled a negligence claim against Mediant. The court held that because "[p]laintiffs have adequately pleaded a substantive claim against Mediant…Mediant's motion to dismiss the declaratory judgment claim is denied." *See also Gem Fin. Serv., Inc. v. City of New York*, 2014 WL 1010408, at *14 (E.D.N.Y. Mar. 17, 2014) (denying motion to dismiss declaratory judgment claim because "Plaintiff has pleaded a plausible § 1983 claim [and], as such, there exists a viable substantive claim from which the Court may issue equitable relief"); *In re GEICO Customer Data Breach Litig.*, 691 F. Supp.3d at 634 (declining to dismiss cause of action for declaratory judgment and treating request as a remedy for the underlying violation); *Travis v. Navient Corp.*, 460 F. Supp. 3d 269, 286 (E.D.N.Y. 2020) (construing cause of action for declaratory judgment as a request for declaratory relief based on underlying claim).

### B. The Absence Of A Private Right Of Action Does Not Foreclose Declaratory Relief

Finally, even if this Court agrees that the NSA does not create an implied private right of action to enforce IDR awards, that does not foreclose a grant of

declaratory relief for the underlying violation of the statutory mandate that the health plan pay awards within 30 days.

The Declaratory Judgment Act expressly states that in the case of an "actual controversy within its jurisdiction," the court "may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*." 28 U.S.C. § 2201(a) (emphasis added). Thus, the availability of a declaratory judgment does not depend on whether alternative relief exists in the form of a private right of action and could also be independently sought on that basis. The district court incorrectly concluded otherwise, holding that absent a private right of action to enforce IDR awards ECAPS cannot state a claim seeking a declaration that it is entitled to payment of its IDR awards. (JA 130 ("to the extent ECAPS seeks a declaration under the NSA itself, ECAPS has not, for the reasons above, shown that there is a private right of action under the NSA")).

The district court's conclusion is therefore legally erroneous given the plain text of the DJA. As shown above, Count 8 asserts a violation of the statutory IDR payment mandate that gives ECAPS a statutory right to payment; ECAPS's possession of IDR awards; and Cigna's refusal to pay the awards or any portion of them. The claim therefore seeks a declaration of "the rights and other legal relations" of the parties, 28 U.S.C. § 2201(a), by seeking a declaration that Cigna has an obligation to pay the IDR awards and ECAPS has a right to receive payment of the

awards. (JA 65). According to the plain text of Section 2201(a), ECAPS need not demonstrate a right to seek "further relief" in the form of a private right of action in order to obtain a declaratory judgment.

A declaratory judgment would not be an abstract remedy. 28 U.S.C. § 2202 authorizes a court to grant "further necessary or proper relief based on a declaratory judgment . . . after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." This statute "permit[s] plaintiffs who have won a non-coercive declaratory judgment from the court to seek subsequent enforcement of that judgment through injunction, damages and other relief." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 298 (2d Cir. 1999). Although not required, the Complaint pleads an entitlement to all "necessary and proper relief" under Section 2202. (JA 65).

## **CONCLUSION**

For the foregoing reasons, the Court should reverse the district court's judgment to the extent it dismissed Count Eight of ECAPS's Complaint, and grant such other relief as the Court deems appropriate.

Dated: December 24, 2025
New York, New York

**LAW OFFICES OF MICHAEL B. WOLK, P.C.**

By: /s/ Michael B. Wolk
Michael B. Wolk
155 East 55th Street, Suite 300B New York, New York 10022
Tel: (917) 238-0576
Email: michael.wolk@wolkgroup.com

- and -

**SCHLAM STONE & DOLAN LLP**

By: /s/ Elizabeth Wolstein
Elizabeth Wolstein
Samuel L. Butt
David J. Goldsmith
26 Broadway, 19th Floor
New York NY 10004
Tel.: (212) 344-5400
Fax: (212) 344-7677
Email: ewolstein@schlamstone.com
Email: sbutt@schlamstone.com
Email: dgoldsmith@schlamstone.com

*Attorneys for Plaintiff-Appellant East Coast Advanced Plastic Surgery LLC*

**Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 11,731 words.
2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

__/s/ Elizabeth Wolstein_______
Elizabeth Wolstein

Dated: December 24, 2025

# ADDENDUM

United States Code Annotated
Title 9. Arbitration (Refs & Annos)
Chapter 1. General Provisions (Refs & Annos)

9 U.S.C.A. § 9

§ 9. Award of arbitrators; confirmation; jurisdiction; procedure

Currentness

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

**CREDIT(S)**

(July 30, 1947, c. 392, 61 Stat. 672.)

9 U.S.C.A. § 9, 9 USCA § 9
Current through P.L. 119-57. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 9. Arbitration (Refs & Annos)
Chapter 1. General Provisions (Refs & Annos)

9 U.S.C.A. § 10

§ 10. Same; vacation; grounds; rehearing

Effective: May 7, 2002
Currentness

**(a)** In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--

**(1)** where the award was procured by corruption, fraud, or undue means;

**(2)** where there was evident partiality or corruption in the arbitrators, or either of them;

**(3)** where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

**(4)** where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

**(b)** If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

**(c)** The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.

## CREDIT(S)

(July 30, 1947, c. 392, 61 Stat. 672; Pub.L. 101-552, § 5, Nov. 15, 1990, 104 Stat. 2745; Pub.L. 102-354, § 5(b)(4), Aug. 26, 1992, 106 Stat. 946; Pub.L. 107-169, § 1, May 7, 2002, 116 Stat. 132.)

9 U.S.C.A. § 10, 9 USCA § 10
Current through P.L. 119-57. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

***RELEVANT PARTS OF STATUTE HIGHLIGHTED IN YELLOW***

United States Code Annotated
Title 29. Labor
Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
Subtitle B. Regulatory Provisions
Part 7. Group Health Plan Requirements
Subpart B. Other Requirements

29 U.S.C.A. § 1185e

§ 1185e. Preventing surprise medical bills

Effective: December 27, 2020
Currentness

**(a) Coverage of emergency services**

**(1) In general**

If a group health plan, or a health insurance issuer offering group health insurance coverage, provides or covers any benefits with respect to services in an emergency department of a hospital or with respect to emergency services in an independent freestanding emergency department (as defined in paragraph (3)(D)), the plan or issuer shall cover emergency services (as defined in paragraph (3)(C))--

**(A)** without the need for any prior authorization determination;

**(B)** whether the health care provider furnishing such services is a participating provider or a participating emergency facility, as applicable, with respect to such services;

**(C)** in a manner so that, if such services are provided to a participant or beneficiary by a nonparticipating provider or a nonparticipating emergency facility--

**(i)** such services will be provided without imposing any requirement under the plan for prior authorization of services or any limitation on coverage that is more restrictive than the requirements or limitations that apply to emergency services received from participating providers and participating emergency facilities with respect to such plan or coverage, respectively;

**(ii)** the cost-sharing requirement is not greater than the requirement that would apply if such services were provided by a participating provider or a participating emergency facility;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(iii)** such cost-sharing requirement is calculated as if the total amount that would have been charged for such services by such participating provider or participating emergency facility were equal to the recognized amount (as defined in paragraph (3)(H)) for such services, plan or coverage, and year;

**(iv)** the group health plan or health insurance issuer, respectively--

**(I)** not later than 30 calendar days after the bill for such services is transmitted by such provider or facility, sends to the provider or facility, as applicable, an initial payment or notice of denial of payment; and

**(II)** pays a total plan or coverage payment directly to such provider or facility, respectively (in accordance, if applicable, with the timing requirement described in subsection (c)(6)) that is, with application of any initial payment under subclause (I), equal to the amount by which the out-of-network rate (as defined in paragraph (3)(K)) for such services exceeds the cost-sharing amount for such services (as determined in accordance with clauses (ii) and (iii)) and year; and

**(v)** any cost-sharing payments made by the participant or beneficiary with respect to such emergency services so furnished shall be counted toward any in-network deductible or out-of-pocket maximums applied under the plan or coverage, respectively (and such in-network deductible and out-of-pocket maximums shall be applied) in the same manner as if such cost-sharing payments were made with respect to emergency services furnished by a participating provider or a participating emergency facility; and

**(D)** without regard to any other term or condition of such coverage (other than exclusion or coordination of benefits, or an affiliation or waiting period, permitted under section 300gg-3 of Title 42, including as incorporated pursuant to section 1185d of this title and section 9815 of Title 26, and other than applicable cost-sharing).

**(2) Regulations for qualifying payment amounts**

Not later than July 1, 2021, the Secretary, in consultation with the Secretary of the Treasury and the Secretary of Health and Human Services, shall establish through rulemaking--

**(A)** the methodology the group health plan or health insurance issuer offering health insurance coverage in the group market shall use to determine the qualifying payment amount, differentiating by large group market, and small group market;

**(B)** the information such plan or issuer, respectively, shall share with the nonparticipating provider or nonparticipating facility, as applicable, when making such a determination;

**(C)** the geographic regions applied for purposes of this subparagraph, taking into account access to items and services in rural and underserved areas, including health professional shortage areas, as defined in section 254e of Title 42; and

**(D)** a process to receive complaints of violations of the requirements described in subclauses (I) and (II) of subparagraph (A)(i) by group health plans and health insurance issuers offering health insurance coverage in the group market.

Such rulemaking shall take into account payments that are made by such plan or issuer, respectively, that are not on a fee-for-service basis. Such methodology may account for relevant payment adjustments that take into account quality or facility type (including higher acuity settings and the case-mix of various facility types) that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities. In carrying out clause (iii), the Secretary shall consult with the National Association of Insurance Commissioners to establish the geographic regions under such clause and shall periodically update such regions, as appropriate, taking into account the findings of the report submitted under section 109(a) of the No Surprises Act.

**(3) Definitions**

In this subpart:

**(A) Emergency department of a hospital**

The term "emergency department of a hospital" includes a hospital outpatient department that provides emergency services (as defined in subparagraph (C)(i)).

**(B) Emergency medical condition**

The term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in a condition described in clause (i), (ii), or (iii) of section 1867(e)(1)(A) of the Social Security Act.

**(C) Emergency services**

**(i) In general**

The term "emergency services", with respect to an emergency medical condition, means--

**(I)** a medical screening examination (as required under section 1867 of the Social Security Act, or as would be required under such section if such section applied to an independent freestanding emergency department) that is within the capability of the emergency department of a hospital or of an independent freestanding emergency department, as applicable, including ancillary services routinely available to the emergency department to evaluate such emergency medical condition; and

**(II)** within the capabilities of the staff and facilities available at the hospital or the independent freestanding emergency department, as applicable, such further medical examination and treatment as are required under section 1867 of such Act, or as would be required under such section if such section applied to an independent freestanding emergency department, to stabilize the patient (regardless of the department of the hospital in which such further examination or treatment is furnished).

**(ii) Inclusion of additional services**

**(I) In general**

For purposes of this subsection and section 300gg-131 of Title 42, in the case of a participant or beneficiary who is enrolled in a group health plan or group health insurance coverage offered by a health insurance issuer and who is furnished services described in clause (i) with respect to an emergency medical condition, the term "emergency services" shall include, unless each of the conditions described in subclause (II) are met, in addition to the items and services described in clause (i), items and services--

**(aa)** for which benefits are provided or covered under the plan or coverage, respectively; and

**(bb)** that are furnished by a nonparticipating provider or nonparticipating emergency facility (regardless of the department of the hospital in which such items or services are furnished) after the participant or beneficiary is stabilized and as part of outpatient observation or an inpatient or outpatient stay with respect to the visit in which the services described in clause (i) are furnished.

**(II) Conditions**

For purposes of subclause (I), the conditions described in this subclause, with respect to a participant or beneficiary who is stabilized and furnished additional items and services described in subclause (I) after such stabilization by a provider or facility described in subclause (I), are the following;

**(aa)** Such provider or facility determines such individual is able to travel using nonmedical transportation or nonemergency medical transportation.

**(bb)** Such provider furnishing such additional items and services satisfies the notice and consent criteria of section 300gg-132(d) of Title 42 with respect to such items and services.

**(cc)** Such individual is in a condition to receive (as determined in accordance with guidelines issued by the Secretary pursuant to rulemaking) the information described in section 300gg-132 of Title 42 and to provide informed consent under such section, in accordance with applicable State law.

**(dd)** Such other conditions, as specified by the Secretary, such as conditions relating to coordinating care transitions to participating providers and facilities.

**(D) Independent freestanding emergency department**

The term "independent freestanding emergency department" means a health care facility that--

**(i)** is geographically separate and distinct and licensed separately from a hospital under applicable State law; and

**(ii)** provides any of the emergency services (as defined in subparagraph (C)(i)).

**(E) Qualifying payment amount**

**(i) In general**

The term "qualifying payment amount" means, subject to clauses (ii) and (iii), with respect to a sponsor of a group health plan and health insurance issuer offering group health insurance coverage--

**(I)** for an item or service furnished during 2022, the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market (specified in subclause (I), (II), or (III) of clause (iv)) as the plan or coverage) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished, consistent with the methodology established by the Secretary under paragraph (2), increased by the percentage increase in the consumer price index for all urban consumers (United States city average) over 2019, such percentage increase over 2020, and such percentage increase over 2021; and

**(II)** for an item or service furnished during 2023 or a subsequent year, the qualifying payment amount determined under this clause for such an item or service furnished in the previous year, increased by the percentage increase in the consumer price index for all urban consumers (United States city average) over such previous year.

**(ii) New plans and coverage**

The term "qualifying payment amount" means, with respect to a sponsor of a group health plan or health insurance issuer offering group health insurance coverage in a geographic region in which such sponsor or issuer, respectively, did not offer any group health plan or health insurance coverage during 2019--

**(I)** for the first year in which such group health plan or health insurance coverage, respectively, is offered in such region, a rate (determined in accordance with a methodology established by the Secretary) for items and services that are covered by such plan and furnished during such first year; and

**(II)** for each subsequent year such group health plan or health insurance coverage, respectively, is offered in such region, the qualifying payment amount determined under this clause for such items and services furnished in the previous year, increased by the percentage increase in the consumer price index for all urban consumers (United States city average) over such previous year.

**(iii) Insufficient information; newly covered items and services**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

In the case of a sponsor of a group health plan or health insurance issuer offering group health insurance coverage that does not have sufficient information to calculate the median of the contracted rates described in clause (i)(I) in 2019 (or, in the case of a newly covered item or service (as defined in clause (v)(III)), in the first coverage year (as defined in clause (v)(I)) for such item or service with respect to such plan or coverage) for an item or service (including with respect to provider type, or amount, of claims for items or services (as determined by the Secretary) provided in a particular geographic region (other than in a case with respect to which clause (ii) applies)) the term "qualifying payment amount"--

**(I)** for an item or service furnished during 2022 (or, in the case of a newly covered item or service, during the first coverage year for such item or service with respect to such plan or coverage), means such rate for such item or service determined by the sponsor or issuer, respectively, through use of any database that is determined, in accordance with rulemaking described in paragraph (2), to not have any conflicts of interest and to have sufficient information reflecting allowed amounts paid to a health care provider or facility for relevant services furnished in the applicable geographic region (such as a State all-payer claims database);

**(II)** for an item or service furnished in a subsequent year (before the first sufficient information year (as defined in clause (v)(II)) for such item or service with respect to such plan or coverage), means the rate determined under subclause (I) or this subclause, as applicable, for such item or service for the year previous to such subsequent year, increased by the percentage increase in the consumer price index for all urban consumers (United States city average) over such previous year;

**(III)** for an item or service furnished in the first sufficient information year for such item or service with respect to such plan or coverage, has the meaning given the term qualifying payment amount in clause (i)(I), except that in applying such clause to such item or service, the reference to "furnished during 2022" shall be treated as a reference to furnished during such first sufficient information year, the reference to "in 2019" shall be treated as a reference to such sufficient information year, and the increase described in such clause shall not be applied; and

**(IV)** for an item or service furnished in any year subsequent to the first sufficient information year for such item or service with respect to such plan or coverage, has the meaning given such term in clause (i)(II), except that in applying such clause to such item or service, the reference to "furnished during 2023 or a subsequent year" shall be treated as a reference to furnished during the year after such first sufficient information year or a subsequent year.

**(iv) Insurance market**

For purposes of clause (i)(I), a health insurance market specified in this clause is one of the following:

**(I)** The large group market (other than plans described in subclause (III)).

**(II)** The small group market (other than plans described in subclause (III)).

**(III)** In the case of a self-insured group health plan, other self-insured group health plans.

**(v) Definitions**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

For purposes of this subparagraph:

**(I) First coverage year**

The term "first coverage year" means, with respect to a group health plan or group health insurance coverage offered by a health insurance issuer and an item or service for which coverage is not offered in 2019 under such plan or coverage, the first year after 2019 for which coverage for such item or service is offered under such plan or health insurance coverage.

**(II) First sufficient information year**

The term "first sufficient information year" means, with respect to a group health plan or group health insurance coverage offered by a health insurance issuer--

**(aa)** in the case of an item or service for which the plan or coverage does not have sufficient information to calculate the median of the contracted rates described in clause (i)(I) in 2019, the first year subsequent to 2022 for which such sponsor or issuer has such sufficient information to calculate the median of such contracted rates in the year previous to such first subsequent year; and

**(bb)** in the case of a newly covered item or service, the first year subsequent to the first coverage year for such item or service with respect to such plan or coverage for which the sponsor or issuer has sufficient information to calculate the median of the contracted rates described in clause (i)(I) in the year previous to such first subsequent year.

**(III) Newly covered item or service**

The term "newly covered item or service" means, with respect to a group health plan or health insurance issuer offering group health insurance coverage, an item or service for which coverage was not offered in 2019 under such plan or coverage, but is offered under such plan or coverage in a year after 2019.

**(F) Nonparticipating emergency facility; participating emergency facility**

**(i) Nonparticipating emergency facility**

The term "nonparticipating emergency facility" means, with respect to an item or service and a group health plan or group health insurance coverage offered by a health insurance issuer, an emergency department of a hospital, or an independent freestanding emergency department, that does not have a contractual relationship directly or indirectly with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively.

**(ii) Participating emergency facility**

The term "participating emergency facility" means, with respect to an item or service and a group health plan or group health insurance coverage offered by a health insurance issuer, an emergency department of a hospital, or an independent

freestanding emergency department, that has a contractual relationship directly or indirectly with the plan or issuer, respectively, with respect to the furnishing of such an item or service at such facility.

**(G) Nonparticipating providers; participating providers**

**(i) Nonparticipating provider**

The term "nonparticipating provider" means, with respect to an item or service and a group health plan or group health insurance coverage offered by a health insurance issuer, a physician or other health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who does not have a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively.

**(ii) Participating provider**

The term "participating provider" means, with respect to an item or service and a group health plan or group health insurance coverage offered by a health insurance issuer, a physician or other health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who has a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively.

**(H) Recognized amount**

The term "recognized amount" means, with respect to an item or service furnished by a nonparticipating provider or nonparticipating emergency facility during a year and a group health plan or group health insurance coverage offered by a health insurance issuer--

**(i)** subject to clause (iii), in the case of such item or service furnished in a State that has in effect a specified State law with respect to such plan, coverage, or issuer, respectively; such a nonparticipating provider or nonparticipating emergency facility; and such an item or service, the amount determined in accordance with such law;

**(ii)** subject to clause (iii), in the case of such item or service furnished in a State that does not have in effect a specified State law, with respect to such plan, coverage, or issuer, respectively; such a nonparticipating provider or nonparticipating emergency facility; and such an item or service, the amount that is the qualifying payment amount (as defined in subparagraph (E)) [1] for such year and determined in accordance with rulemaking described in paragraph (2)) [1] for such item or service; or

**(iii)** in the case of such item or service furnished in a State with an All-Payer Model Agreement under section 1115A of the Social Security Act, the amount that the State approves under such system for such item or service so furnished.

**(I) Specified State law**

The term "specified State law" means, with respect to a State, an item or service furnished by a nonparticipating provider or nonparticipating emergency facility during a year and a group health plan or group health insurance coverage offered by a health insurance issuer, a State law that provides for a method for determining the total amount payable under such a plan, coverage, or issuer, respectively (to the extent such State law applies to such plan, coverage, or issuer, subject to section 1144 of this title) in the case of a participant or beneficiary covered under such plan or coverage and receiving such item or service from such a nonparticipating provider or nonparticipating emergency facility.

**(J) Stabilize**

The term "to stabilize", with respect to an emergency medical condition (as defined in subparagraph (B)), has the meaning give[2] in section 1867(e)(3) of the Social Security Act (42 U.S.C. 1395dd(e)(3)).

**(K) Out-of-network rate**

The term "out-of-network rate" means, with respect to an item or service furnished in a State during a year to a participant or beneficiary of a group health plan or group health insurance coverage offered by a health insurance issuer receiving such item or service from a nonparticipating provider or nonparticipating emergency facility--

**(i)** subject to clause (iii), in the case of such item or service furnished in a State that has in effect a specified State law with respect to such plan, coverage, or issuer, respectively; such a nonparticipating provider or nonparticipating emergency facility; and such an item or service, the amount determined in accordance with such law;

**(ii)** subject to clause (iii), in the case such State does not have in effect such a law with respect to such item or service, plan, and provider or facility--

**(I)** subject to subclause (II), if the provider or facility (as applicable) and such plan or coverage agree on an amount of payment (including if such agreed on amount is the initial payment sent by the plan under subsection (a)(1)(C)(iv)(I), subsection (b)(1)(C), or section 1185f(a)(3)(A) of this title, as applicable, or is agreed on through open negotiations under subsection (c)(1)) with respect to such item or service, such agreed on amount; or

**(II)** if such provider or facility (as applicable) and such plan or coverage enter the independent dispute resolution process under subsection (c) and do not so agree before the date on which a certified IDR entity (as defined in paragraph (4) of such subsection) makes a determination with respect to such item or service under such subsection, the amount of such determination; or

**(iii)** in the case such State has an All-Payer Model Agreement under section 1115A of the Social Security Act, the amount that the State approves under such system for such item or service so furnished.

**(L) Cost-sharing**

The term "cost-sharing" includes copayments, coinsurance, and deductibles.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(b) Coverage of non-emergency services performed by nonparticipating providers at certain participating facilities**

**(1) In general**

In the case of items or services (other than emergency services to which subsection (a) applies) for which any benefits are provided or covered by a group health plan or health insurance issuer offering group health insurance coverage furnished to a participant or beneficiary of such plan or coverage by a nonparticipating provider (as defined in subsection (a)(3)(G)(i)) (and who, with respect to such items and services, has not satisfied the notice and consent criteria of section 300gg-132(d) of Title 42) with respect to a visit (as defined by the Secretary in accordance with paragraph (2)(B)) at a participating health care facility (as defined in paragraph (2)(A)), with respect to such plan or coverage, respectively, the plan or coverage, respectively--

**(A)** shall not impose on such participant or beneficiary a cost-sharing requirement for such items and services so furnished that is greater than the cost-sharing requirement that would apply under such plan or coverage, respectively, had such items or services been furnished by a participating provider (as defined in subsection (a)(3)(G)(ii));

**(B)** shall calculate such cost-sharing requirement as if the total amount that would have been charged for such items and services by such participating provider were equal to the recognized amount (as defined in subsection (a)(3)(H)) for such items and services, plan or coverage, and year;

**(C)** not later than 30 calendar days after the bill for such items or services is transmitted by such provider, shall send to the provider an initial payment or notice of denial of payment;

**(D)** shall pay a total plan or coverage payment directly, in accordance, if applicable, with the timing requirement described in subsection (c)(6), to such provider furnishing such items and services to such participant or beneficiary that is, with application of any initial payment under subparagraph (C), equal to the amount by which the out-of-network rate (as defined in subsection (a)(3)(K)) for such items and services exceeds the cost-sharing amount imposed under the plan or coverage, respectively, for such items and services (as determined in accordance with subparagraphs (A) and (B)) and year; and

**(E)** shall count toward any in-network deductible and in-network out-of-pocket maximums (as applicable) applied under the plan or coverage, respectively, any cost-sharing payments made by the participant or beneficiary (and such in-network deductible and out-of-pocket maximums shall be applied) with respect to such items and services so furnished in the same manner as if such cost-sharing payments were with respect to items and services furnished by a participating provider.

**(2) Definitions**

In this section:

**(A) Participating health care facility**

**(i) In general**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

The term “participating health care facility” means, with respect to an item or service and a group health plan or health insurance issuer offering group health insurance coverage, a health care facility described in clause (ii) that has a direct or indirect contractual relationship with the plan or issuer, respectively, with respect to the furnishing of such an item or service at the facility.

**(ii) Health care facility described**

A health care facility described in this clause, with respect to a group health plan or group health insurance coverage, is each of the following:

**(I)** A hospital (as defined in section 1861(e) of the Social Security Act).

**(II)** A hospital outpatient department.

**(III)** A critical access hospital (as defined in section 1861(mm)(1) of such Act).

**(IV)** An ambulatory surgical center described in section 1833(i)(1)(A) of such Act.

**(V)** Any other facility, specified by the Secretary, that provides items or services for which coverage is provided under the plan or coverage, respectively.

**(B) Visit**

The term “visit” shall, with respect to items and services furnished to an individual at a health care facility, include equipment and devices, telemedicine services, imaging services, laboratory services, preoperative and postoperative services, and such other items and services as the Secretary may specify, regardless of whether or not the provider furnishing such items or services is at the facility.

**(c) Determination of out-of-network rates to be paid by health plans; independent dispute resolution process**

**(1) Determination through open negotiation**

**(A) In general**

With respect to an item or service furnished in a year by a nonparticipating provider or a nonparticipating facility, with respect to a group health plan or health insurance issuer offering group health insurance coverage, in a State described in subsection (a)(3)(K)(ii) with respect to such plan or coverage and provider or facility, and for which a payment is required to be made by the plan or coverage pursuant to subsection (a)(1) or (b)(1), the provider or facility (as applicable) or plan or coverage may, during the 30-day period beginning on the day the provider or facility receives an initial payment or a notice of denial of payment from the plan or coverage regarding a claim for payment for such item or service, initiate open negotiations under this paragraph between such provider or facility and plan or coverage for purposes of determining, during the open negotiation period, an amount agreed on by such provider or facility, respectively, and such plan or coverage

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

for payment (including any cost-sharing) for such item or service. For purposes of this subsection, the open negotiation period, with respect to an item or service, is the 30-day period beginning on the date of initiation of the negotiations with respect to such item or service.

**(B) Accessing independent dispute resolution process in case of failed negotiations**

In the case of open negotiations pursuant to subparagraph (A), with respect to an item or service, that do not result in a determination of an amount of payment for such item or service by the last day of the open negotiation period described in such subparagraph with respect to such item or service, the provider or facility (as applicable) or group health plan or health insurance issuer offering group health insurance coverage that was party to such negotiations may, during the 4-day period beginning on the day after such open negotiation period, initiate the independent dispute resolution process under paragraph (2) with respect to such item or service. The independent dispute resolution process shall be initiated by a party pursuant to the previous sentence by submission to the other party and to the Secretary of a notification (containing such information as specified by the Secretary) and for purposes of this subsection, the date of initiation of such process shall be the date of such submission or such other date specified by the Secretary pursuant to regulations that is not later than the date of receipt of such notification by both the other party and the Secretary.

**(2) Independent dispute resolution process available in case of failed open negotiations**

**(A) Establishment**

Not later than 1 year after December 27, 2020, the Secretary, jointly with the Secretary of Health and Human Services and the Secretary of the Treasury, shall establish by regulation one independent dispute resolution process (referred to in this subsection as the "IDR process") under which, in the case of an item or service with respect to which a provider or facility (as applicable) or group health plan or health insurance issuer offering group health insurance coverage submits a notification under paragraph (1)(B) (in this subsection referred to as a "qualified IDR item or service"), a certified IDR entity under paragraph (4) determines, subject to subparagraph (B) and in accordance with the succeeding provisions of this subsection, the amount of payment under the plan or coverage for such item or service furnished by such provider or facility.

**(B) Authority to continue negotiations**

Under the independent dispute resolution process, in the case that the parties to a determination for a qualified IDR item or service agree on a payment amount for such item or service during such process but before the date on which the entity selected with respect to such determination under paragraph (4) makes such determination under paragraph (5), such amount shall be treated for purposes of subsection (a)(3)(K)(ii) as the amount agreed to by such parties for such item or service. In the case of an agreement described in the previous sentence, the independent dispute resolution process shall provide for a method to determine how to allocate between the parties to such determination the payment of the compensation of the entity selected with respect to such determination.

**(C) Clarification**

A nonparticipating provider may not, with respect to an item or service furnished by such provider, submit a notification under paragraph (1)(B) if such provider is exempt from the requirement under subsection (a) of section 300gg-132 of Title 42 with respect to such item or service pursuant to subsection (b) of such section.

**(3) Treatment of batching of items and services**

**(A) In general**

Under the IDR process, the Secretary shall specify criteria under which multiple qualified IDR dispute items and services are permitted to be considered jointly as part of a single determination by an entity for purposes of encouraging the efficiency (including minimizing costs) of the IDR process. Such items and services may be so considered only if--

**(i)** such items and services to be included in such determination are furnished by the same provider or facility;

**(ii)** payment for such items and services is required to be made by the same group health plan or health insurance issuer;

**(iii)** such items and services are related to the treatment of a similar condition; and

**(iv)** such items and services were furnished during the 30 day period following the date on which the first item or service included with respect to such determination was furnished or an alternative period as determined by the Secretary, for use in limited situations, such as by the consent of the parties or in the case of low-volume items and services, to encourage procedural efficiency and minimize health plan and provider administrative costs.

**(B) Treatment of bundled payments**

In carrying out subparagraph (A), the Secretary shall provide that, in the case of items and services which are included by a provider or facility as part of a bundled payment, such items and services included in such bundled payment may be part of a single determination under this subsection.

**(4) Certification and selection of IDR entities**

**(A) In general**

The Secretary, jointly with the Secretary of Health and Human Services and Secretary of the Treasury, shall establish a process to certify (including to recertify) entities under this paragraph. Such process shall ensure that an entity so certified--

**(i)** has (directly or through contracts or other arrangements) sufficient medical, legal, and other expertise and sufficient staffing to make determinations described in paragraph (5) on a timely basis;

**(ii)** is not--

**(I)** a group health plan or health insurance issuer offering group health insurance coverage, provider, or facility;

**(II)** an affiliate or a subsidiary of such a group health plan or health insurance issuer, provider, or facility; or

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(III)** an affiliate or subsidiary of a professional or trade association of such group health plans or health insurance issuers or of providers or facilities;

**(iii)** carries out the responsibilities of such an entity in accordance with this subsection;

**(iv)** meets appropriate indicators of fiscal integrity;

**(v)** maintains the confidentiality (in accordance with regulations promulgated by the Secretary) of individually identifiable health information obtained in the course of conducting such determinations;

**(vi)** does not under the IDR process carry out any determination with respect to which the entity would not pursuant to subclause (I), (II), or (III) of subparagraph (F)(i) be eligible for selection; and

**(vii)** meets such other requirements as determined appropriate by the Secretary.

**(B) Period of certification**

Subject to subparagraph (C), each certification (including a recertification) of an entity under the process described in subparagraph (A) shall be for a 5-year period.

**(C) Revocation**

A certification of an entity under this paragraph may be revoked under the process described in subparagraph (A) if the entity has a pattern or practice of noncompliance with any of the requirements described in such subparagraph.

**(D) Petition for denial or withdrawal**

The process described in subparagraph (A) shall ensure that an individual, provider, facility, or group health plan or health insurance issuer offering group health insurance coverage may petition for a denial of a certification or a revocation of a certification with respect to an entity under this paragraph for failure of meeting a requirement of this subsection.

**(E) Sufficient number of entities**

The process described in subparagraph (A) shall ensure that a sufficient number of entities are certified under this paragraph to ensure the timely and efficient provision of determinations described in paragraph (5).

**(F) Selection of certified IDR entity**

The Secretary shall, with respect to the determination of the amount of payment under this subsection of an item or service, provide for a method--

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(i)** that allows for the group health plan or health insurance issuer offering group health insurance coverage and the nonparticipating provider or the nonparticipating emergency facility (as applicable) involved in a notification under paragraph (1)(B) to jointly select, not later than the last day of the 3-business day period following the date of the initiation of the process with respect to such item or service, for purposes of making such determination, an entity certified under this paragraph that--

**(I)** is not a party to such determination or an employee or agent of such a party;

**(II)** does not have a material familial, financial, or professional relationship with such a party; and

**(III)** does not otherwise have a conflict of interest with such a party (as determined by the Secretary); and

**(ii)** that requires, in the case such parties do not make such selection by such last day, the Secretary to, not later than 6 business days after such date of initiation--

**(I)** select such an entity that satisfies subclauses (I) through (III) of clause (i)); and

**(II)** provide notification of such selection to the provider or facility (as applicable) and the plan or issuer (as applicable) party to such determination.

An entity selected pursuant to the previous sentence to make a determination described in such sentence shall be referred to in this subsection as the "certified IDR entity" with respect to such determination.

**(5) Payment determination**

**(A) In general**

Not later than 30 days after the date of selection of the certified IDR entity with respect to a determination for a qualified IDR item or service, the certified IDR entity shall--

**(i)** taking into account the considerations specified in subparagraph (C), select one of the offers submitted under subparagraph (B) to be the amount of payment for such item or service determined under this subsection for purposes of subsection (a)(1) or (b)(1), as applicable; and

**(ii)** notify the provider or facility and the group health plan or health insurance issuer offering group health insurance coverage party to such determination of the offer selected under clause (i).

**(B) Submission of offers**

Not later than 10 days after the date of selection of the certified IDR entity with respect to a determination for a qualified IDR item or service, the provider or facility and the group health plan or health insurance issuer offering group health insurance coverage party to such determination--

**(i)** shall each submit to the certified IDR entity with respect to such determination--

**(I)** an offer for a payment amount for such item or service furnished by such provider or facility; and

**(II)** such information as requested by the certified IDR entity relating to such offer; and

**(ii)** may each submit to the certified IDR entity with respect to such determination any information relating to such offer submitted by either party, including information relating to any circumstance described in subparagraph (C)(ii).

**(C) Considerations in determination**

**(i) In general**

In determining which offer is the payment to be applied pursuant to this paragraph, the certified IDR entity, with respect to the determination for a qualified IDR item or service shall consider--

**(I)** the qualifying payment amounts (as defined in subsection (a)(3)(E)) for the applicable year for items or services that are comparable to the qualified IDR item or service and that are furnished in the same geographic region (as defined by the Secretary for purposes of such subsection) as such qualified IDR item or service; and

**(II)** subject to subparagraph (D), information on any circumstance described in clause (ii), such information as requested in subparagraph (B)(i)(II), and any additional information provided in subparagraph (B)(ii).

**(ii) Additional circumstances**

For purposes of clause (i)(II), the circumstances described in this clause are, with respect to a qualified IDR item or service of a nonparticipating provider, nonparticipating emergency facility, group health plan, or health insurance issuer of group health insurance coverage the following:

**(I)** The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service (such as those endorsed by the consensus-based entity authorized in section 1890 of the Social Security Act).

**(II)** The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided.

**(III)** The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual.

**(IV)** The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service.

**(V)** Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years.

**(D) Prohibition on consideration of certain factors**

In determining which offer is the payment to be applied with respect to qualified IDR items and services furnished by a provider or facility, the certified IDR entity with respect to a determination shall not consider usual and customary charges, the amount that would have been billed by such provider or facility with respect to such items and services had the provisions of section 300gg-131 of Title 42 or section 300gg-132 of such title (as applicable) not applied, or the payment or reimbursement rate for such items and services furnished by such provider or facility payable by a public payor, including under the Medicare program under title XVIII of the Social Security Act, under the Medicaid program under title XIX of such Act, under the Children's Health Insurance Program under title XXI of such Act, under the TRICARE program under chapter 55 of Title 10, or under chapter 17 of Title 38.

**(E) Effects of determination**

**(i) In general**

A determination of a certified IDR entity under subparagraph (A)--

**(I)** shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and

**(II)** shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9.

**(ii) Suspension of certain subsequent IDR requests**

In the case of a determination of a certified IDR entity under subparagraph (A), with respect to an initial notification submitted under paragraph (1)(B) with respect to qualified IDR items and services and the two parties involved with such notification, the party that submitted such notification may not submit during the 90-day period following such determination a subsequent notification under such paragraph involving the same other party to such notification with respect to such an item or service that was the subject of such initial notification.

**(iii) Subsequent submission of requests permitted**

In the case of a notification that pursuant to clause (ii) is not permitted to be submitted under paragraph (1)(B) during a 90-day period specified in such clause, if the end of the open negotiation period specified in paragraph (1)(A), that but for this clause would otherwise apply with respect to such notification, occurs during such 90-day period, such paragraph (1)(B) shall be applied as if the reference in such paragraph to the 4-day period beginning on the day after such open negotiation period were instead a reference to the 30-day period beginning on the day after the last day of such 90-day period.

**(iv) Reports**

The Secretary, jointly with the Secretary of Health and Human Services and the Secretary of the Treasury, shall examine the impact of the application of clause (ii) and whether the application of such clause delays payment determinations or impacts early, alternative resolution of claims (such as through open negotiations), and shall submit to Congress, not later than 2 years after the date of implementation of such clause an interim report (and not later than 4 years after such date of implementation, a final report) on whether any group health plans or health insurance issuers offering group or individual health insurance coverage or types of such plans or coverage have a pattern or practice of routine denial, low payment, or down-coding of claims, or otherwise abuse the 90-day period described in such clause, including recommendations on ways to discourage such a pattern or practice.

**(F) Costs of independent dispute resolution process**

In the case of a notification under paragraph (1)(B) submitted by a nonparticipating provider, nonparticipating emergency facility, group health plan, or health insurance issuer offering group health insurance coverage and submitted to a certified IDR entity--

**(i)** if such entity makes a determination with respect to such notification under subparagraph (A), the party whose offer is not chosen under such subparagraph shall be responsible for paying all fees charged by such entity; and

**(ii)** if the parties reach a settlement with respect to such notification prior to such a determination, each party shall pay half of all fees charged by such entity, unless the parties otherwise agree.

**(6) Timing of payment**

The total plan or coverage payment required pursuant to subsection (a)(1) or (b)(1), with respect to a qualified IDR item or service for which a determination is made under paragraph (5)(A) or with respect to an item or service for which a payment amount is determined under open negotiations under paragraph (1), shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made.

**(7) Publication of information relating to the IDR process**

**(A) Publication of information**

For each calendar quarter in 2022 and each calendar quarter in a subsequent year, the Secretary shall make available on the public website of the Department of Labor--

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(i)** the number of notifications submitted under paragraph (1)(B) during such calendar quarter;

**(ii)** the size of the provider practices and the size of the facilities submitting notifications under paragraph (1)(B) during such calendar quarter;

**(iii)** the number of such notifications with respect to which a determination was made under paragraph (5)(A);

**(iv)** the information described in subparagraph (B) with respect to each notification with respect to which such a determination was so made;

**(v)** the number of times the payment amount determined (or agreed to) under this subsection exceeds the qualifying payment amount, specified by items and services;

**(vi)** the amount of expenditures made by the Secretary during such calendar quarter to carry out the IDR process;

**(vii)** the total amount of fees paid under paragraph (8) during such calendar quarter; and

**(viii)** the total amount of compensation paid to certified IDR entities under paragraph (5)(F) during such calendar quarter.

**(B) Information**

For purposes of subparagraph (A), the information described in this subparagraph is, with respect to a notification under paragraph (1)(B) by a nonparticipating provider, nonparticipating emergency facility, group health plan, or health insurance issuer offering group health insurance coverage--

**(i)** a description of each item and service included with respect to such notification;

**(ii)** the geography in which the items and services with respect to such notification were provided;

**(iii)** the amount of the offer submitted under paragraph (5)(B) by the group health plan or health insurance issuer (as applicable) and by the nonparticipating provider or nonparticipating emergency facility (as applicable) expressed as a percentage of the qualifying payment amount;

**(iv)** whether the offer selected by the certified IDR entity under paragraph (5) to be the payment applied was the offer submitted by such plan or issuer (as applicable) or by such provider or facility (as applicable) and the amount of such offer so selected expressed as a percentage of the qualifying payment amount;

**(v)** the category and practice specialty of each such provider or facility involved in furnishing such items and services;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(vi)** the identity of the health plan or health insurance issuer, provider, or facility, with respect to the notification;

**(vii)** the length of time in making each determination;

**(viii)** the compensation paid to the certified IDR entity with respect to the settlement or determination; and

**(ix)** any other information specified by the Secretary.

**(C) IDR entity requirements**

For 2022 and each subsequent year, an IDR entity, as a condition of certification as an IDR entity, shall submit to the Secretary such information as the Secretary determines necessary to carry out the provisions of this subsection.

**(D) Clarification**

The Secretary shall ensure the public reporting under this paragraph does not contain information that would disclose privileged or confidential information of a group health plan or health insurance issuer offering group or individual health insurance coverage or of a provider or facility.

**(8) Administrative fee**

**(A) In general**

Each party to a determination under paragraph (5) to which an entity is selected under paragraph (3)[3] in a year shall pay to the Secretary, at such time and in such manner as specified by the Secretary, a fee for participating in the IDR process with respect to such determination in an amount described in subparagraph (B) for such year.

**(B) Amount of fee**

The amount described in this subparagraph for a year is an amount established by the Secretary in a manner such that the total amount of fees paid under this paragraph for such year is estimated to be equal to the amount of expenditures estimated to be made by the Secretary for such year in carrying out the IDR process.

**(9) Waiver authority**

The Secretary may modify any deadline or other timing requirement specified under this subsection (other than the establishment date for the IDR process under paragraph (2)(A) and other than under paragraph (6)) in cases of extenuating circumstances, as specified by the Secretary, or to ensure that all claims that occur during a 90-day period described in paragraph (5)(E)(ii), but with respect to which a notification is not permitted by reason of such paragraph to be submitted under paragraph (1)(B) during such period, are eligible for the IDR process.

**(d) Certain access fees to certain databases**

In the case of a sponsor of a group health plan or health insurance issuer offering group health insurance coverage that, pursuant to subsection (a)(3)(E)(iii), uses a database described in such subsection to determine a rate to apply under such subsection for an item or service by reason of having insufficient information described in such subsection with respect to such item or service, such sponsor or issuer shall cover the cost for access to such database.

**(e) Transparency regarding in-network and out-of-network deductibles and out-of-pocket limitations**

A group health plan or a health insurance issuer offering group health insurance coverage and providing or covering any benefit with respect to items or services shall include, in clear writing, on any physical or electronic plan or insurance identification card issued to the participants or beneficiaries in the plan or coverage the following:

**(1)** Any deductible applicable to such plan or coverage.

**(2)** Any out-of-pocket maximum limitation applicable to such plan or coverage.

**(3)** A telephone number and Internet website address through which such individual may seek consumer assistance information, such as information related to hospitals and urgent care facilities that have in effect a contractual relationship with such plan or coverage for furnishing items and services under such plan or coverage [4]

**(f) Advanced explanation of benefits**

**(1) In general**

For plan years beginning on or after January 1, 2022, each group health plan, or a health insurance issuer offering group health insurance coverage shall, with respect to a notification submitted under section 300gg-136 of Title 42 by a health care provider or health care facility to the plan or issuer for a participant or beneficiary under plan or coverage scheduled to receive an item or service from the provider or facility (or authorized representative of such participant or beneficiary), not later than 1 business day (or, in the case such item or service was so scheduled at least 10 business days before such item or service is to be furnished (or in the case of a request made to such plan or coverage by such participant or beneficiary), 3 business days) after the date on which the plan or coverage receives such notification (or such request), provide to the participant or beneficiary (through mail or electronic means, as requested by the participant or beneficiary) a notification (in clear and understandable language) including the following:

**(A)** Whether or not the provider or facility is a participating provider or a participating facility with respect to the plan or coverage with respect to the furnishing of such item or service and--

**(i)** in the case the provider or facility is a participating provider or facility with respect to the plan or coverage with respect to the furnishing of such item or service, the contracted rate under such plan for such item or service (based on the billing and diagnostic codes provided by such provider or facility); and

**(ii)** in the case the provider or facility is a nonparticipating provider or facility with respect to such plan or coverage, a description of how such individual may obtain information on providers and facilities that, with respect to such plan or coverage, are participating providers and facilities, if any.

**(B)** The good faith estimate included in the notification received from the provider or facility (if applicable) based on such codes.

**(C)** A good faith estimate of the amount the health plan is responsible for paying for items and services included in the estimate described in subparagraph (B).

**(D)** A good faith estimate of the amount of any cost-sharing for which the participant or beneficiary would be responsible for such item or service (as of the date of such notification).

**(E)** A good faith estimate of the amount that the participant or beneficiary has incurred toward meeting the limit of the financial responsibility (including with respect to deductibles and out-of-pocket maximums) under the plan or coverage (as of the date of such notification).

**(F)** In the case such item or service is subject to a medical management technique (including concurrent review, prior authorization, and step-therapy or fail-first protocols) for coverage under the plan or coverage, a disclaimer that coverage for such item or service is subject to such medical management technique.

**(G)** A disclaimer that the information provided in the notification is only an estimate based on the items and services reasonably expected, at the time of scheduling (or requesting) the item or service, to be furnished and is subject to change.

**(H)** Any other information or disclaimer the plan or coverage determines appropriate that is consistent with information and disclaimers required under this section.

**(2) Authority to modify timing requirements in the case of specified items and services**

**(A) In general**

In the case of a participant or beneficiary scheduled to receive an item or service that is a specified item or service (as defined in subparagraph (B)), the Secretary may modify any timing requirements relating to the provision of the notification described in paragraph (1) to such participant or beneficiary with respect to such item or service. Any modification made by the Secretary pursuant to the previous sentence may not result in the provision of such notification after such participant or beneficiary has been furnished such item or service.

**(B) Specified item or service defined**

For purposes of subparagraph (A), the term "specified item or service" means an item or service that has low utilization or significant variation in costs (such as when furnished as part of a complex treatment), as specified by the Secretary.

### CREDIT(S)

(Pub.L. 93-406, Title I, § 716, as added and amended Pub.L. 116-260, Div. BB, Title I, §§ 102(b)(1), 103(b), 107(b), 111(c), Dec. 27, 2020, 134 Stat. 2772, 2806, 2858, 2865.)

## Footnotes

1 Closing parentheses so in original.

2 So in original. Probably should be “given”.

3 So in original. Probably should be “paragraph (4)”.

4 So in original. Probably should be followed by a period.

29 U.S.C.A. § 1185e, 29 USCA § 1185e
Current through P.L. 119-57. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

***RELEVANT PARTS OF STATUTE HIGHLIGHTED IN YELLOW***

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 6A. Public Health Service (Refs & Annos)
Subchapter XXV. Requirements Relating to Health Insurance Coverage (Refs & Annos)
Part A. Individual and Group Market Reforms (Refs & Annos)
Subpart 2. Exclusion of Plans; Enforcement; Preemption (Refs & Annos)

42 U.S.C.A. § 300gg-22

§ 300gg-22. Enforcement

Effective: December 27, 2020
Currentness

**(a) State enforcement**

**(1) State authority**

Subject to section 300gg-23 of this title, each State may require that health insurance issuers that issue, sell, renew, or offer health insurance coverage in the State in the individual or group market meet the requirements of this part and part D with respect to such issuers.

**(2) Failure to implement provisions**

In the case of a determination by the Secretary that a State has failed to substantially enforce a provision (or provisions) in this part or part D with respect to health insurance issuers in the State, the Secretary shall enforce such provision (or provisions) under subsection (b) insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage in connection with group health plans or individual health insurance coverage in such State.

**(b) Secretarial enforcement authority**

**(1) Limitation**

The provisions of this subsection shall apply to enforcement of a provision (or provisions) of this part or part D only--

**(A)** as provided under subsection (a)(2); and

**(B)** with respect to individual health insurance coverage or group health plans that are non-Federal governmental plans.

**(2) Imposition of penalties**

In the cases described in paragraph (1)--

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(A) In general**

Subject to the succeeding provisions of this subsection, any non-Federal governmental plan that is a group health plan and any health insurance issuer that fails to meet a provision of this part or part D applicable to such plan or issuer is subject to a civil money penalty under this subsection.

**(B) Liability for penalty**

In the case of a failure by--

**(i)** a health insurance issuer, the issuer is liable for such penalty, or

**(ii)** a group health plan that is a non-Federal governmental plan which is--

**(I)** sponsored by 2 or more employers, the plan is liable for such penalty, or

**(II)** not so sponsored, the employer is liable for such penalty.

**(C) Amount of penalty**

**(i) In general**

The maximum amount of penalty imposed under this paragraph is $100 for each day for each individual with respect to which such a failure occurs.

**(ii) Considerations in imposition**

In determining the amount of any penalty to be assessed under this paragraph, the Secretary shall take into account the previous record of compliance of the entity being assessed with the applicable provisions of this part and part D and the gravity of the violation.

**(iii) Limitations**

**(I) Penalty not to apply where failure not discovered exercising reasonable diligence**

No civil money penalty shall be imposed under this paragraph on any failure during any period for which it is established to the satisfaction of the Secretary that none of the entities against whom the penalty would be imposed knew, or exercising reasonable diligence would have known, that such failure existed.

**(II) Penalty not to apply to failures corrected within 30 days**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

No civil money penalty shall be imposed under this paragraph on any failure if such failure was due to reasonable cause and not to willful neglect, and such failure is corrected during the 30-day period beginning on the first day any of the entities against whom the penalty would be imposed knew, or exercising reasonable diligence would have known, that such failure existed.

**(D) Administrative review**

**(i) Opportunity for hearing**

The entity assessed shall be afforded an opportunity for hearing by the Secretary upon request made within 30 days after the date of the issuance of a notice of assessment. In such hearing the decision shall be made on the record pursuant to section 554 of Title 5. If no hearing is requested, the assessment shall constitute a final and unappealable order.

**(ii) Hearing procedure**

If a hearing is requested, the initial agency decision shall be made by an administrative law judge, and such decision shall become the final order unless the Secretary modifies or vacates the decision. Notice of intent to modify or vacate the decision of the administrative law judge shall be issued to the parties within 30 days after the date of the decision of the judge. A final order which takes effect under this paragraph shall be subject to review only as provided under subparagraph (E).

**(E) Judicial review**

**(i) Filing of action for review**

Any entity against whom an order imposing a civil money penalty has been entered after an agency hearing under this paragraph may obtain review by the United States district court for any district in which such entity is located or the United States District Court for the District of Columbia by filing a notice of appeal in such court within 30 days from the date of such order, and simultaneously sending a copy of such notice by registered mail to the Secretary.

**(ii) Certification of administrative record**

The Secretary shall promptly certify and file in such court the record upon which the penalty was imposed.

**(iii) Standard for review**

The findings of the Secretary shall be set aside only if found to be unsupported by substantial evidence as provided by section 706(2)(E) of Title 5.

**(iv) Appeal**

Any final decision, order, or judgment of the district court concerning such review shall be subject to appeal as provided in chapter 83 of Title 28.

**(F) Failure to pay assessment; maintenance of action**

**(i) Failure to pay assessment**

If any entity fails to pay an assessment after it has become a final and unappealable order, or after the court has entered final judgment in favor of the Secretary, the Secretary shall refer the matter to the Attorney General who shall recover the amount assessed by action in the appropriate United States district court.

**(ii) Nonreviewability**

In such action the validity and appropriateness of the final order imposing the penalty shall not be subject to review.

**(G) Payment of penalties**

Except as otherwise provided, penalties collected under this paragraph shall be paid to the Secretary (or other officer) imposing the penalty and shall be available without appropriation and until expended for the purpose of enforcing the provisions with respect to which the penalty was imposed.

**(3) Enforcement authority relating to genetic discrimination**

**(A) General rule**

In the cases described in paragraph (1), notwithstanding the provisions of paragraph (2)(C), the succeeding subparagraphs of this paragraph shall apply with respect to an action under this subsection by the Secretary with respect to any failure of a health insurance issuer in connection with a group health plan, to meet the requirements of subsection (a)(1)(F), (b)(3), (c), or (d) of section 2702 or section 2701 or 2702(b)(1) with respect to genetic information in connection with the plan.

**(B) Amount**

**(i) In general**

The amount of the penalty imposed under this paragraph shall be $100 for each day in the noncompliance period with respect to each participant or beneficiary to whom such failure relates.

**(ii) Noncompliance period**

For purposes of this paragraph, the term "noncompliance period" means, with respect to any failure, the period--

**(I)** beginning on the date such failure first occurs; and

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(II)** ending on the date the failure is corrected.

**(C) Minimum penalties where failure discovered**

Notwithstanding clauses (i) and (ii) of subparagraph (D):

**(i) In general**

In the case of 1 or more failures with respect to an individual--

**(I)** which are not corrected before the date on which the plan receives a notice from the Secretary of such violation; and

**(II)** which occurred or continued during the period involved;

the amount of penalty imposed by subparagraph (A) by reason of such failures with respect to such individual shall not be less than $2,500.

**(ii) Higher minimum penalty where violations are more than de minimis**

To the extent violations for which any person is liable under this paragraph for any year are more than de minimis, clause (i) shall be applied by substituting "$15,000" for "$2,500" with respect to such person.

**(D) Limitations**

**(i) Penalty not to apply where failure not discovered exercising reasonable diligence**

No penalty shall be imposed by subparagraph (A) on any failure during any period for which it is established to the satisfaction of the Secretary that the person otherwise liable for such penalty did not know, and exercising reasonable diligence would not have known, that such failure existed.

**(ii) Penalty not to apply to failures corrected within certain periods**

No penalty shall be imposed by subparagraph (A) on any failure if--

**(I)** such failure was due to reasonable cause and not to willful neglect; and

**(II)** such failure is corrected during the 30-day period beginning on the first date the person otherwise liable for such penalty knew, or exercising reasonable diligence would have known, that such failure existed.

**(iii) Overall limitation for unintentional failures**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

In the case of failures which are due to reasonable cause and not to willful neglect, the penalty imposed by subparagraph (A) for failures shall not exceed the amount equal to the lesser of--

**(I)** 10 percent of the aggregate amount paid or incurred by the employer (or predecessor employer) during the preceding taxable year for group health plans; or

**(II)** $500,000.

**(E) Waiver by Secretary**

In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the penalty imposed by subparagraph (A) to the extent that the payment of such penalty would be excessive relative to the failure involved.

**CREDIT(S)**

(July 1, 1944, c. 373, Title XXVII, § 2723, formerly § 2722, as added Pub.L. 104-191, Title I, § 102(a), Aug. 21, 1996, 110 Stat. 1968; amended Pub.L. 110-233, Title I, § 102(a)(5), May 21, 2008, 122 Stat. 891; renumbered § 2736, renumbered § 2723 and amended Pub.L. 111-148, Title I, §§ 1001(4), 1563(c)(13), formerly § 1562(c)(13), Title X, § 10107(b)(1), Mar. 23, 2010, 124 Stat. 130, 269, 911; Pub.L. 116-260, Div. BB, Title I, § 102(a)(3)(C), Dec. 27, 2020, 134 Stat. 2772.)

42 U.S.C.A. § 300gg-22, 42 USCA § 300gg-22
Current through P.L. 119-57. Some statute sections may be more current, see credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

***RELEVANT PARTS OF STATUTE HIGHLIGHTED IN YELLOW***

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 6A. Public Health Service (Refs & Annos)
Subchapter XXV. Requirements Relating to Health Insurance Coverage (Refs & Annos)
Part D. Additional Coverage Provisions

42 U.S.C.A. § 300gg-111

§ 300gg-111. Preventing surprise medical bills

Effective: December 27, 2020
Currentness

**(a) Coverage of emergency services**

**(1) In general**

If a group health plan, or a health insurance issuer offering group or individual health insurance coverage, provides or covers any benefits with respect to services in an emergency department of a hospital or with respect to emergency services in an independent freestanding emergency department (as defined in paragraph (3)(D)), the plan or issuer shall cover emergency services (as defined in paragraph (3)(C))--

**(A)** without the need for any prior authorization determination;

**(B)** whether the health care provider furnishing such services is a participating provider or a participating emergency facility, as applicable, with respect to such services;

**(C)** in a manner so that, if such services are provided to a participant, beneficiary, or enrollee by a nonparticipating provider or a nonparticipating emergency facility--

**(i)** such services will be provided without imposing any requirement under the plan or coverage for prior authorization of services or any limitation on coverage that is more restrictive than the requirements or limitations that apply to emergency services received from participating providers and participating emergency facilities with respect to such plan or coverage, respectively;

**(ii)** the cost-sharing requirement is not greater than the requirement that would apply if such services were provided by a participating provider or a participating emergency facility;

**(iii)** such cost-sharing requirement is calculated as if the total amount that would have been charged for such services by such participating provider or participating emergency facility were equal to the recognized amount (as defined in paragraph (3)(H)) for such services, plan or coverage, and year;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(iv)** the group health plan or health insurance issuer, respectively--

**(I)** not later than 30 calendar days after the bill for such services is transmitted by such provider or facility, sends to the provider or facility, as applicable, an initial payment or notice of denial of payment; and

**(II)** pays a total plan or coverage payment directly to such provider or facility, respectively (in accordance, if applicable, with the timing requirement described in subsection (c)(6)) that is, with application of any initial payment under subclause (I), equal to the amount by which the out-of-network rate (as defined in paragraph (3)(K)) for such services exceeds the cost-sharing amount for such services (as determined in accordance with clauses (ii) and (iii)) and year; and

**(v)** any cost-sharing payments made by the participant, beneficiary, or enrollee with respect to such emergency services so furnished shall be counted toward any in-network deductible or out-of-pocket maximums applied under the plan or coverage, respectively (and such in-network deductible and out-of-pocket maximums shall be applied) in the same manner as if such cost-sharing payments were made with respect to emergency services furnished by a participating provider or a participating emergency facility; and

**(D)** without regard to any other term or condition of such coverage (other than exclusion or coordination of benefits, or an affiliation or waiting period, permitted under section 300gg-3 of this title, including as incorporated pursuant to section 1185d of Title 29 and section 9815 of Title 26, and other than applicable cost-sharing).

**(2) Audit process and regulations for qualifying payment amounts**

**(A) Audit process**

**(i) In general**

Not later than October 1, 2021, the Secretary, in consultation with the Secretary of Labor and the Secretary of the Treasury, shall establish through rulemaking a process, in accordance with clause (ii), under which group health plans and health insurance issuers offering group or individual health insurance coverage are audited by the Secretary or applicable State authority to ensure that--

**(I)** such plans and coverage are in compliance with the requirement of applying a qualifying payment amount under this section; and

**(II)** such qualifying payment amount so applied satisfies the definition under paragraph (3)(E) with respect to the year involved, including with respect to a group health plan or health insurance issuer described in clause (ii) of such paragraph (3)(E).

**(ii) Audit samples**

Under the process established pursuant to clause (i), the Secretary--

**(I)** shall conduct audits described in such clause, with respect to a year (beginning with 2022), of a sample with respect to such year of claims data from not more than 25 group health plans and health insurance issuers offering group or individual health insurance coverage; and

**(II)** may audit any group health plan or health insurance issuer offering group or individual health insurance coverage if the Secretary has received any complaint or other information about such plan or coverage, respectively, that involves the compliance of the plan or coverage, respectively, with either of the requirements described in subclauses (I) and (II) of such clause.

**(iii) Reports**

Beginning for 2022, the Secretary shall annually submit to Congress a report on the number of plans and issuers with respect to which audits were conducted during such year pursuant to this subparagraph.

**(B) Rulemaking**

Not later than July 1, 2021, the Secretary, in consultation with the Secretary of Labor and the Secretary of the Treasury, shall establish through rulemaking--

**(i)** the methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use to determine the qualifying payment amount, differentiating by individual market, large group market, and small group market;

**(ii)** the information such plan or issuer, respectively, shall share with the nonparticipating provider or nonparticipating facility, as applicable, when making such a determination;

**(iii)** the geographic regions applied for purposes of this subparagraph, taking into account access to items and services in rural and underserved areas, including health professional shortage areas, as defined in section 254e of this title; and

**(iv)** a process to receive complaints of violations of the requirements described in subclauses (I) and (II) of subparagraph (A)(i) by group health plans and health insurance issuers offering group or individual health insurance coverage.

Such rulemaking shall take into account payments that are made by such plan or issuer, respectively, that are not on a fee-for-service basis. Such methodology may account for relevant payment adjustments that take into account quality or facility type (including higher acuity settings and the case-mix of various facility types) that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities. In carrying out clause (iii), the Secretary shall consult with the National Association of Insurance Commissioners to establish the geographic regions under such clause and shall periodically update such regions, as appropriate, taking into account the findings of the report submitted under section 109(a) of the No Surprises Act.

**(3) Definitions**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

In this part and part E:

**(A) Emergency department of a hospital**

The term "emergency department of a hospital" includes a hospital outpatient department that provides emergency services (as defined in subparagraph (C)(i)).

**(B) Emergency medical condition**

The term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in a condition described in clause (i), (ii), or (iii) of section 1867(e)(1)(A) of the Social Security Act.

**(C) Emergency services**

**(i) In general**

The term "emergency services", with respect to an emergency medical condition, means--

**(I)** a medical screening examination (as required under section 1867 of the Social Security Act, or as would be required under such section if such section applied to an independent freestanding emergency department) that is within the capability of the emergency department of a hospital or of an independent freestanding emergency department, as applicable, including ancillary services routinely available to the emergency department to evaluate such emergency medical condition; and

**(II)** within the capabilities of the staff and facilities available at the hospital or the independent freestanding emergency department, as applicable, such further medical examination and treatment as are required under section 1395dd of this title, or as would be required under such section if such section applied to an independent freestanding emergency department, to stabilize the patient (regardless of the department of the hospital in which such further examination or treatment is furnished).

**(ii) Inclusion of additional services**

**(I) In general**

For purposes of this subsection and section 300gg-131 of this title, in the case of a participant, beneficiary, or enrollee who is enrolled in a group health plan or group or individual health insurance coverage offered by a health insurance issuer and who is furnished services described in clause (i) with respect to an emergency medical condition, the term "emergency services" shall include, unless each of the conditions described in subclause (II) are met, in addition to the items and services described in clause (i), items and services--

**(aa)** for which benefits are provided or covered under the plan or coverage, respectively; and

**(bb)** that are furnished by a nonparticipating provider or nonparticipating emergency facility (regardless of the department of the hospital in which such items or services are furnished) after the participant, beneficiary, or enrollee is stabilized and as part of outpatient observation or an inpatient or outpatient stay with respect to the visit in which the services described in clause (i) are furnished.

**(II) Conditions**

For purposes of subclause (I), the conditions described in this subclause, with respect to a participant, beneficiary, or enrollee who is stabilized and furnished additional items and services described in subclause (I) after such stabilization by a provider or facility described in subclause (I), are the following;

**(aa)** Such provider or facility determines such individual is able to travel using nonmedical transportation or nonemergency medical transportation.

**(bb)** Such provider furnishing such additional items and services satisfies the notice and consent criteria of section 300gg-132(d) of this title with respect to such items and services.

**(cc)** Such individual is in a condition to receive (as determined in accordance with guidelines issued by the Secretary pursuant to rulemaking) the information described in section 300gg-132 of this title and to provide informed consent under such section, in accordance with applicable State law.

**(dd)** Such other conditions, as specified by the Secretary, such as conditions relating to coordinating care transitions to participating providers and facilities.

**(D) Independent freestanding emergency department**

The term "independent freestanding emergency department" means a health care facility that--

**(i)** is geographically separate and distinct and licensed separately from a hospital under applicable State law; and

**(ii)** provides any of the emergency services (as defined in subparagraph (C)(i)).

**(E) Qualifying payment amount**

**(i) In general**

The term "qualifying payment amount" means, subject to clauses (ii) and (iii), with respect to a sponsor of a group health plan and health insurance issuer offering group or individual health insurance coverage--

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(I)** for an item or service furnished during 2022, the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market (specified in subclause (I), (II), (III), or (IV) of clause (iv)) as the plan or coverage) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished, consistent with the methodology established by the Secretary under paragraph (2)(B), increased by the percentage increase in the consumer price index for all urban consumers (United States city average) over 2019, such percentage increase over 2020, and such percentage increase over 2021; and

**(II)** for an item or service furnished during 2023 or a subsequent year, the qualifying payment amount determined under this clause for such an item or service furnished in the previous year, increased by the percentage increase in the consumer price index for all urban consumers (United States city average) over such previous year.

**(ii) New plans and coverage**

The term "qualifying payment amount" means, with respect to a sponsor of a group health plan or health insurance issuer offering group or individual health insurance coverage in a geographic region in which such sponsor or issuer, respectively, did not offer any group health plan or health insurance coverage during 2019--

**(I)** for the first year in which such group health plan, group health insurance coverage, or individual health insurance coverage, respectively, is offered in such region, a rate (determined in accordance with a methodology established by the Secretary) for items and services that are covered by such plan or coverage and furnished during such first year; and

**(II)** for each subsequent year such group health plan, group health insurance coverage, or individual health insurance coverage, respectively, is offered in such region, the qualifying payment amount determined under this clause for such items and services furnished in the previous year, increased by the percentage increase in the consumer price index for all urban consumers (United States city average) over such previous year.

**(iii) Insufficient information; newly covered items and services**

In the case of a sponsor of a group health plan or health insurance issuer offering group or individual health insurance coverage that does not have sufficient information to calculate the median of the contracted rates described in clause (i)(I) in 2019 (or, in the case of a newly covered item or service (as defined in clause (v)(III)), in the first coverage year (as defined in clause (v)(I)) for such item or service with respect to such plan or coverage) for an item or service (including with respect to provider type, or amount, of claims for items or services (as determined by the Secretary) provided in a particular geographic region (other than in a case with respect to which clause (ii) applies)) the term "qualifying payment amount"--

**(I)** for an item or service furnished during 2022 (or, in the case of a newly covered item or service, during the first coverage year for such item or service with respect to such plan or coverage), means such rate for such item or service determined by the sponsor or issuer, respectively, through use of any database that is determined, in accordance with rulemaking described in paragraph (2)(B), to not have any conflicts of interest and to have sufficient information

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

reflecting allowed amounts paid to a health care provider or facility for relevant services furnished in the applicable geographic region (such as a State all-payer claims database);

**(II)** for an item or service furnished in a subsequent year (before the first sufficient information year (as defined in clause (v)(II)) for such item or service with respect to such plan or coverage), means the rate determined under subclause (I) or this subclause, as applicable, for such item or service for the year previous to such subsequent year, increased by the percentage increase in the consumer price index for all urban consumers (United States city average) over such previous year;

**(III)** for an item or service furnished in the first sufficient information year for such item or service with respect to such plan or coverage, has the meaning given the term qualifying payment amount in clause (i)(I), except that in applying such clause to such item or service, the reference to "furnished during 2022" shall be treated as a reference to furnished during such first sufficient information year, the reference to "in 2019"[1] shall be treated as a reference to such sufficient information year, and the increase described in such clause shall not be applied; and

**(IV)** for an item or service furnished in any year subsequent to the first sufficient information year for such item or service with respect to such plan or coverage, has the meaning given such term in clause (i)(II), except that in applying such clause to such item or service, the reference to "furnished during 2023 or a subsequent year" shall be treated as a reference to furnished during the year after such first sufficient information year or a subsequent year.

**(iv) Insurance market**

For purposes of clause (i)(I), a health insurance market specified in this clause is one of the following:

**(I)** The individual market.

**(II)** The large group market (other than plans described in subclause (IV)).

**(III)** The small group market (other than plans described in subclause (IV)).

**(IV)** In the case of a self-insured group health plan, other self-insured group health plans.

**(v) Definitions**

For purposes of this subparagraph:

**(I) First coverage year**

The term "first coverage year" means, with respect to a group health plan or group or individual health insurance coverage offered by a health insurance issuer and an item or service for which coverage is not offered in 2019 under such plan or coverage, the first year after 2019 for which coverage for such item or service is offered under such plan or health insurance coverage.

**(II) First sufficient information year**

The term "first sufficient information year" means, with respect to a group health plan or group or individual health insurance coverage offered by a health insurance issuer--

**(aa)** in the case of an item or service for which the plan or coverage does not have sufficient information to calculate the median of the contracted rates described in clause (i)(I) in 2019, the first year subsequent to 2022 for which the sponsor or issuer has such sufficient information to calculate the median of such contracted rates in the year previous to such first subsequent year; and

**(bb)** in the case of a newly covered item or service, the first year subsequent to the first coverage year for such item or service with respect to such plan or coverage for which the sponsor or issuer has sufficient information to calculate the median of the contracted rates described in clause (i)(I) in the year previous to such first subsequent year.

**(III) Newly covered item or service**

The term "newly covered item or service" means, with respect to a group health plan or group or individual health insurance issuer offering health insurance coverage, an item or service for which coverage was not offered in 2019 under such plan or coverage, but is offered under such plan or coverage in a year after 2019.

**(F) Nonparticipating emergency facility; participating emergency facility**

**(i) Nonparticipating emergency facility**

The term "nonparticipating emergency facility" means, with respect to an item or service and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, an emergency department of a hospital, or an independent freestanding emergency department, that does not have a contractual relationship directly or indirectly with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively.

**(ii) Participating emergency facility**

The term "participating emergency facility" means, with respect to an item or service and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, an emergency department of a hospital, or an independent freestanding emergency department, that has a contractual relationship directly or indirectly with the plan or issuer, respectively, with respect to the furnishing of such an item or service at such facility.

**(G) Nonparticipating providers; participating providers**

**(i) Nonparticipating provider**

The term "nonparticipating provider" means, with respect to an item or service and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, a physician or other health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who does not have a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively.

**(ii) Participating provider**

The term "participating provider" means, with respect to an item or service and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, a physician or other health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who has a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively.

**(H) Recognized amount**

The term "recognized amount" means, with respect to an item or service furnished by a nonparticipating provider or nonparticipating emergency facility during a year and a group health plan or group or individual health insurance coverage offered by a health insurance issuer--

**(i)** subject to clause (iii), in the case of such item or service furnished in a State that has in effect a specified State law with respect to such plan, coverage, or issuer, respectively; such a nonparticipating provider or nonparticipating emergency facility; and such an item or service, the amount determined in accordance with such law;

**(ii)** subject to clause (iii), in the case of such item or service furnished in a State that does not have in effect a specified State law, with respect to such plan, coverage, or issuer, respectively; such a nonparticipating provider or nonparticipating emergency facility; and such an item or service, the amount that is the qualifying payment amount (as defined in subparagraph (E))[2] for such year and determined in accordance with rulemaking described in paragraph (2)(B)) for such item or service; or

**(iii)** in the case of such item or service furnished in a State with an All-Payer Model Agreement under section 1115A of the Social Security Act, the amount that the State approves under such system for such item or service so furnished.

**(I) Specified State law**

The term "specified State law" means, with respect to a State, an item or service furnished by a nonparticipating provider or nonparticipating emergency facility during a year and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, a State law that provides for a method for determining the total amount payable under such a plan, coverage, or issuer, respectively (to the extent such State law applies to such plan, coverage, or issuer, subject to section 1144 of Title 29) in the case of a participant, beneficiary, or enrollee covered under such plan or coverage and receiving such item or service from such a nonparticipating provider or nonparticipating emergency facility.

**(J) Stabilize**

The term “to stabilize”, with respect to an emergency medical condition (as defined in subparagraph (B)), has the meaning give[3] in section 1867(e)(3) of the Social Security Act.

**(K) Out-of-network rate**

The term “out-of-network rate” means, with respect to an item or service furnished in a State during a year to a participant, beneficiary, or enrollee of a group health plan or group or individual health insurance coverage offered by a health insurance issuer receiving such item or service from a nonparticipating provider or nonparticipating emergency facility--

**(i)** subject to clause (iii), in the case of such item or service furnished in a State that has in effect a specified State law with respect to such plan, coverage, or issuer, respectively; such a nonparticipating provider or nonparticipating emergency facility; and such an item or service, the amount determined in accordance with such law;

**(ii)** subject to clause (iii), in the case such State does not have in effect such a law with respect to such item or service, plan, and provider or facility--

**(I)** subject to subclause (II), if the provider or facility (as applicable) and such plan or coverage agree on an amount of payment (including if such agreed on amount is the initial payment sent by the plan under subsection (a)(1)(C)(iv)(I), subsection (b)(1)(C), or section 300gg-112(a)(3)(A) of this title, as applicable, or is agreed on through open negotiations under subsection (c)(1)) with respect to such item or service, such agreed on amount; or

**(II)** if such provider or facility (as applicable) and such plan or coverage enter the independent dispute resolution process under subsection (c) and do not so agree before the date on which a certified IDR entity (as defined in paragraph (4) of such subsection) makes a determination with respect to such item or service under such subsection, the amount of such determination; or

**(iii)** in the case such State has an All-Payer Model Agreement under section 1115A of the Social Security Act, the amount that the State approves under such system for such item or service so furnished.

**(L) Cost-sharing**

The term “cost-sharing” includes copayments, coinsurance, and deductibles.

**(b) Coverage of non-emergency services performed by nonparticipating providers at certain participating facilities**

**(1) In general**

In the case of items or services (other than emergency services to which subsection (a) applies) for which any benefits are provided or covered by a group health plan or health insurance issuer offering group or individual health insurance coverage furnished to a participant, beneficiary, or enrollee of such plan or coverage by a nonparticipating provider (as defined in subsection (a)(3)(G)(i)) (and who, with respect to such items and services, has not satisfied the notice and consent criteria of section 300gg-132(d) of this title) with respect to a visit (as defined by the Secretary in accordance with paragraph (2)(B))

at a participating health care facility (as defined in paragraph (2)(A)), with respect to such plan or coverage, respectively, the plan or coverage, respectively--

**(A)** shall not impose on such participant, beneficiary, or enrollee a cost-sharing requirement for such items and services so furnished that is greater than the cost-sharing requirement that would apply under such plan or coverage, respectively, had such items or services been furnished by a participating provider (as defined in subsection (a)(3)(G)(ii));

**(B)** shall calculate such cost-sharing requirement as if the total amount that would have been charged for such items and services by such participating provider were equal to the recognized amount (as defined in subsection (a)(3)(H)) for such items and services, plan or coverage, and year;

**(C)** not later than 30 calendar days after the bill for such services is transmitted by such provider, shall send to the provider an initial payment or notice of denial of payment;

**(D)** shall pay a total plan or coverage payment directly, in accordance, if applicable, with the timing requirement described in subsection (c)(6), to such provider furnishing such items and services to such participant, beneficiary, or enrollee that is, with application of any initial payment under subparagraph (C), equal to the amount by which the out-of-network rate (as defined in subsection (a)(3)(K)) for such items and services involved exceeds the cost-sharing amount imposed under the plan or coverage, respectively, for such items and services (as determined in accordance with subparagraphs (A) and (B)) and year; and

**(E)** shall count toward any in-network deductible and in-network out-of-pocket maximums (as applicable) applied under the plan or coverage, respectively, any cost-sharing payments made by the participant, beneficiary, or enrollee (and such in-network deductible and out-of-pocket maximums shall be applied) with respect to such items and services so furnished in the same manner as if such cost-sharing payments were with respect to items and services furnished by a participating provider.

**(2) Definitions**

In this section:

**(A) Participating health care facility**

**(i) In general**

The term "participating health care facility" means, with respect to an item or service and a group health plan or health insurance issuer offering group or individual health insurance coverage, a health care facility described in clause (ii) that has a direct or indirect contractual relationship with the plan or issuer, respectively, with respect to the furnishing of such an item or service at the facility.

**(ii) Health care facility described**

A health care facility described in this clause, with respect to a group health plan or group or individual health insurance coverage, is each of the following:

**(I)** A hospital (as defined in section 1861(e) of the Social Security Act).

**(II)** A hospital outpatient department.

**(III)** A critical access hospital (as defined in section 1861(mm)(1) of such Act).

**(IV)** An ambulatory surgical center described in section 1833(i)(1)(A) of such Act.

**(V)** Any other facility, specified by the Secretary, that provides items or services for which coverage is provided under the plan or coverage, respectively.

**(B) Visit**

The term "visit" shall, with respect to items and services furnished to an individual at a health care facility, include equipment and devices, telemedicine services, imaging services, laboratory services, preoperative and postoperative services, and such other items and services as the Secretary may specify, regardless of whether or not the provider furnishing such items or services is at the facility.

**(c) Determination of out-of-network rates to be paid by health plans; independent dispute resolution process**

**(1) Determination through open negotiation**

**(A) In general**

With respect to an item or service furnished in a year by a nonparticipating provider or a nonparticipating facility, with respect to a group health plan or health insurance issuer offering group or individual health insurance coverage, in a State described in subsection (a)(3)(K)(ii) with respect to such plan or coverage and provider or facility, and for which a payment is required to be made by the plan or coverage pursuant to subsection (a)(1) or (b)(1), the provider or facility (as applicable) or plan or coverage may, during the 30-day period beginning on the day the provider or facility receives an initial payment or a notice of denial of payment from the plan or coverage regarding a claim for payment for such item or service, initiate open negotiations under this paragraph between such provider or facility and plan or coverage for purposes of determining, during the open negotiation period, an amount agreed on by such provider or facility, respectively, and such plan or coverage for payment (including any cost-sharing) for such item or service. For purposes of this subsection, the open negotiation period, with respect to an item or service, is the 30-day period beginning on the date of initiation of the negotiations with respect to such item or service.

**(B) Accessing independent dispute resolution process in case of failed negotiations**

In the case of open negotiations pursuant to subparagraph (A), with respect to an item or service, that do not result in a determination of an amount of payment for such item or service by the last day of the open negotiation period described in such subparagraph with respect to such item or service, the provider or facility (as applicable) or group health plan or health insurance issuer offering group or individual health insurance coverage that was party to such negotiations may, during the 4-day period beginning on the day after such open negotiation period, initiate the independent dispute resolution process under paragraph (2) with respect to such item or service. The independent dispute resolution process shall be initiated by a party pursuant to the previous sentence by submission to the other party and to the Secretary of a notification (containing such information as specified by the Secretary) and for purposes of this subsection, the date of initiation of such process shall be the date of such submission or such other date specified by the Secretary pursuant to regulations that is not later than the date of receipt of such notification by both the other party and the Secretary.

**(2) Independent dispute resolution process available in case of failed open negotiations**

**(A) Establishment**

Not later than 1 year after December 27, 2020, the Secretary, jointly with the Secretary of Labor and the Secretary of the Treasury, shall establish by regulation one independent dispute resolution process (referred to in this subsection as the "IDR process") under which, in the case of an item or service with respect to which a provider or facility (as applicable) or group health plan or health insurance issuer offering group or individual health insurance coverage submits a notification under paragraph (1)(B) (in this subsection referred to as a "qualified IDR item or service"), a certified IDR entity under paragraph (4) determines, subject to subparagraph (B) and in accordance with the succeeding provisions of this subsection, the amount of payment under the plan or coverage for such item or service furnished by such provider or facility.

**(B) Authority to continue negotiations**

Under the independent dispute resolution process, in the case that the parties to a determination for a qualified IDR item or service agree on a payment amount for such item or service during such process but before the date on which the entity selected with respect to such determination under paragraph (4) makes such determination under paragraph (5), such amount shall be treated for purposes of subsection (a)(3)(K)(ii) as the amount agreed to by such parties for such item or service. In the case of an agreement described in the previous sentence, the independent dispute resolution process shall provide for a method to determine how to allocate between the parties to such determination the payment of the compensation of the entity selected with respect to such determination.

**(C) Clarification**

A nonparticipating provider may not, with respect to an item or service furnished by such provider, submit a notification under paragraph (1)(B) if such provider is exempt from the requirement under subsection (a) of section 300gg-132 of this title with respect to such item or service pursuant to subsection (b) of such section.

**(3) Treatment of batching of items and services**

**(A) In general**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Under the IDR process, the Secretary shall specify criteria under which multiple qualified IDR dispute items and services are permitted to be considered jointly as part of a single determination by an entity for purposes of encouraging the efficiency (including minimizing costs) of the IDR process. Such items and services may be so considered only if--

**(i)** such items and services to be included in such determination are furnished by the same provider or facility;

**(ii)** payment for such items and services is required to be made by the same group health plan or health insurance issuer;

**(iii)** such items and services are related to the treatment of a similar condition; and

**(iv)** such items and services were furnished during the 30 day[4] period following the date on which the first item or service included with respect to such determination was furnished or an alternative period as determined by the Secretary, for use in limited situations, such as by the consent of the parties or in the case of low-volume items and services, to encourage procedural efficiency and minimize health plan and provider administrative costs.

**(B) Treatment of bundled payments**

In carrying out subparagraph (A), the Secretary shall provide that, in the case of items and services which are included by a provider or facility as part of a bundled payment, such items and services included in such bundled payment may be part of a single determination under this subsection.

**(4) Certification and selection of IDR entities**

**(A) In general**

The Secretary, in consultation with the Secretary of Labor and Secretary of the Treasury, shall establish a process to certify (including to recertify) entities under this paragraph. Such process shall ensure that an entity so certified--

**(i)** has (directly or through contracts or other arrangements) sufficient medical, legal, and other expertise and sufficient staffing to make determinations described in paragraph (5) on a timely basis;

**(ii)** is not--

**(I)** a group health plan or health insurance issuer offering group or individual health insurance coverage, provider, or facility;

**(II)** an affiliate or a subsidiary of such a group health plan or health insurance issuer, provider, or facility; or

**(III)** an affiliate or subsidiary of a professional or trade association of such group health plans or health insurance issuers or of providers or facilities;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(iii)** carries out the responsibilities of such an entity in accordance with this subsection;

**(iv)** meets appropriate indicators of fiscal integrity;

**(v)** maintains the confidentiality (in accordance with regulations promulgated by the Secretary) of individually identifiable health information obtained in the course of conducting such determinations;

**(vi)** does not under the IDR process carry out any determination with respect to which the entity would not pursuant to subclause (I), (II), or (III) of subparagraph (F)(i) be eligible for selection; and

**(vii)** meets such other requirements as determined appropriate by the Secretary.

**(B) Period of certification**

Subject to subparagraph (C), each certification (including a recertification) of an entity under the process described in subparagraph (A) shall be for a 5-year period.

**(C) Revocation**

A certification of an entity under this paragraph may be revoked under the process described in subparagraph (A) if the entity has a pattern or practice of noncompliance with any of the requirements described in such subparagraph.

**(D) Petition for denial or withdrawal**

The process described in subparagraph (A) shall ensure that an individual, provider, facility, or group health plan or health insurance issuer offering group or individual health insurance coverage may petition for a denial of a certification or a revocation of a certification with respect to an entity under this paragraph for failure of meeting a requirement of this subsection.

**(E) Sufficient number of entities**

The process described in subparagraph (A) shall ensure that a sufficient number of entities are certified under this paragraph to ensure the timely and efficient provision of determinations described in paragraph (5).

**(F) Selection of certified IDR entity**

The Secretary shall, with respect to the determination of the amount of payment under this subsection of an item or service, provide for a method--

**(i)** that allows for the group health plan or health insurance issuer offering group or individual health insurance coverage and the nonparticipating provider or the nonparticipating emergency facility (as applicable) involved in a notification under paragraph (1)(B) to jointly select, not later than the last day of the 3-business day period following the date of the initiation of the process with respect to such item or service, for purposes of making such determination, an entity certified under this paragraph that--

**(I)** is not a party to such determination or an employee or agent of such a party;

**(II)** does not have a material familial, financial, or professional relationship with such a party; and

**(III)** does not otherwise have a conflict of interest with such a party (as determined by the Secretary); and

**(ii)** that requires, in the case such parties do not make such selection by such last day, the Secretary to, not later than 6 business days after such date of initiation--

**(I)** select such an entity that satisfies subclauses (I) through (III) of clause (i)); and

**(II)** provide notification of such selection to the provider or facility (as applicable) and the plan or issuer (as applicable) party to such determination.

An entity selected pursuant to the previous sentence to make a determination described in such sentence shall be referred to in this subsection as the "certified IDR entity" with respect to such determination.

**(5) Payment determination**

**(A) In general**

Not later than 30 days after the date of selection of the certified IDR entity with respect to a determination for a qualified IDR item or service, the certified IDR entity shall--

**(i)** taking into account the considerations specified in subparagraph (C), select one of the offers submitted under subparagraph (B) to be the amount of payment for such item or service determined under this subsection for purposes of subsection (a)(1) or (b)(1), as applicable; and

**(ii)** notify the provider or facility and the group health plan or health insurance issuer offering group or individual health insurance coverage party to such determination of the offer selected under clause (i).

**(B) Submission of offers**

Not later than 10 days after the date of selection of the certified IDR entity with respect to a determination for a qualified IDR item or service, the provider or facility and the group health plan or health insurance issuer offering group or individual health insurance coverage party to such determination--

**(i)** shall each submit to the certified IDR entity with respect to such determination--

**(I)** an offer for a payment amount for such item or service furnished by such provider or facility; and

**(II)** such information as requested by the certified IDR entity relating to such offer; and

**(ii)** may each submit to the certified IDR entity with respect to such determination any information relating to such offer submitted by either party, including information relating to any circumstance described in subparagraph (C)(ii).

**(C) Considerations in determination**

**(i) In general**

In determining which offer is the payment to be applied pursuant to this paragraph, the certified IDR entity, with respect to the determination for a qualified IDR item or service shall consider--

**(I)** the qualifying payment amounts (as defined in subsection (a)(3)(E)) for the applicable year for items or services that are comparable to the qualified IDR item or service and that are furnished in the same geographic region (as defined by the Secretary for purposes of such subsection) as such qualified IDR item or service; and

**(II)** subject to subparagraph (D), information on any circumstance described in clause (ii), such information as requested in subparagraph (B)(i)(II), and any additional information provided in subparagraph (B)(ii).

**(ii) Additional circumstances**

For purposes of clause (i)(II), the circumstances described in this clause are, with respect to a qualified IDR item or service of a nonparticipating provider, nonparticipating emergency facility, group health plan, or health insurance issuer of group or individual health insurance coverage the following:

**(I)** The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service (such as those endorsed by the consensus-based entity authorized in section 1395aaa of this title).

**(II)** The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided.

**(III)** The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual.

**(IV)** The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service.

**(V)** Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years.

**(D) Prohibition on consideration of certain factors**

In determining which offer is the payment to be applied with respect to qualified IDR items and services furnished by a provider or facility, the certified IDR entity with respect to a determination shall not consider usual and customary charges, the amount that would have been billed by such provider or facility with respect to such items and services had the provisions of section 300gg-131 or 300gg-132 of this title (as applicable) not applied, or the payment or reimbursement rate for such items and services furnished by such provider or facility payable by a public payor, including under the Medicare program under title XVIII of the Social Security Act, under the Medicaid program under title XIX of such Act, under the Children's Health Insurance Program under title XXI of such Act, under the TRICARE program under chapter 55 of Title 10, or under chapter 17 of Title 38.

**(E) Effects of determination**

**(i) In general**

A determination of a certified IDR entity under subparagraph (A)--

**(I)** shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and

**(II)** shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9.

**(ii) Suspension of certain subsequent IDR requests**

In the case of a determination of a certified IDR entity under subparagraph (A), with respect to an initial notification submitted under paragraph (1)(B) with respect to qualified IDR items and services and the two parties involved with such notification, the party that submitted such notification may not submit during the 90-day period following such determination a subsequent notification under such paragraph involving the same other party to such notification with respect to such an item or service that was the subject of such initial notification.

**(iii) Subsequent submission of requests permitted**

In the case of a notification that pursuant to clause (ii) is not permitted to be submitted under paragraph (1)(B) during a 90-day period specified in such clause, if the end of the open negotiation period specified in paragraph (1)(A), that

but for this clause would otherwise apply with respect to such notification, occurs during such 90-day period, such paragraph (1)(B) shall be applied as if the reference in such paragraph to the 4-day period beginning on the day after such open negotiation period were instead a reference to the 30-day period beginning on the day after the last day of such 90-day period.

**(iv) Reports**

The Secretary, jointly with the Secretary of Labor and the Secretary of the Treasury, shall examine the impact of the application of clause (ii) and whether the application of such clause delays payment determinations or impacts early, alternative resolution of claims (such as through open negotiations), and shall submit to Congress, not later than 2 years after the date of implementation of such clause an interim report (and not later than 4 years after such date of implementation, a final report) on whether any group health plans or health insurance issuers offering group or individual health insurance coverage or types of such plans or coverage have a pattern or practice of routine denial, low payment, or down-coding of claims, or otherwise abuse the 90-day period described in such clause, including recommendations on ways to discourage such a pattern or practice.

**(F) Costs of independent dispute resolution process**

In the case of a notification under paragraph (1)(B) submitted by a nonparticipating provider, nonparticipating emergency facility, group health plan, or health insurance issuer offering group or individual health insurance coverage and submitted to a certified IDR entity--

**(i)** if such entity makes a determination with respect to such notification under subparagraph (A), the party whose offer is not chosen under such subparagraph shall be responsible for paying all fees charged by such entity; and

**(ii)** if the parties reach a settlement with respect to such notification prior to such a determination, each party shall pay half of all fees charged by such entity, unless the parties otherwise agree.

**(6) Timing of payment**

The total plan or coverage payment required pursuant to subsection (a)(1) or (b)(1), with respect to a qualified IDR item or service for which a determination is made under paragraph (5)(A) or with respect to an item or service for which a payment amount is determined under open negotiations under paragraph (1), shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made.

**(7) Publication of information relating to the IDR process**

**(A) Publication of information**

For each calendar quarter in 2022 and each calendar quarter in a subsequent year, the Secretary shall make available on the public website of the Department of Health and Human Services--

**(i)** the number of notifications submitted under paragraph (1)(B) during such calendar quarter;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(ii)** the size of the provider practices and the size of the facilities submitting notifications under paragraph (1)(B) during such calendar quarter;

**(iii)** the number of such notifications with respect to which a determination was made under paragraph (5)(A);

**(iv)** the information described in subparagraph (B) with respect to each notification with respect to which such a determination was so made;

**(v)** the number of times the payment amount determined (or agreed to) under this subsection exceeds the qualifying payment amount, specified by items and services;

**(vi)** the amount of expenditures made by the Secretary during such calendar quarter to carry out the IDR process;

**(vii)** the total amount of fees paid under paragraph (8) during such calendar quarter; and

**(viii)** the total amount of compensation paid to certified IDR entities under paragraph (5)(F) during such calendar quarter.

**(B) Information**

For purposes of subparagraph (A), the information described in this subparagraph is, with respect to a notification under paragraph (1)(B) by a nonparticipating provider, nonparticipating emergency facility, group health plan, or health insurance issuer offering group or individual health insurance coverage--

**(i)** a description of each item and service included with respect to such notification;

**(ii)** the geography in which the items and services with respect to such notification were provided;

**(iii)** the amount of the offer submitted under paragraph (5)(B) by the group health plan or health insurance issuer (as applicable) and by the nonparticipating provider or nonparticipating emergency facility (as applicable) expressed as a percentage of the qualifying payment amount;

**(iv)** whether the offer selected by the certified IDR entity under paragraph (5) to be the payment applied was the offer submitted by such plan or issuer (as applicable) or by such provider or facility (as applicable) and the amount of such offer so selected expressed as a percentage of the qualifying payment amount;

**(v)** the category and practice specialty of each such provider or facility involved in furnishing such items and services;

**(vi)** the identity of the health plan or health insurance issuer, provider, or facility, with respect to the notification;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(vii)** the length of time in making each determination;

**(viii)** the compensation paid to the certified IDR entity with respect to the settlement or determination; and

**(ix)** any other information specified by the Secretary.

**(C) IDR entity requirements**

For 2022 and each subsequent year, an IDR entity, as a condition of certification as an IDR entity, shall submit to the Secretary such information as the Secretary determines necessary to carry out the provisions of this subsection.

**(D) Clarification**

The Secretary shall ensure the public reporting under this paragraph does not contain information that would disclose privileged or confidential information of a group health plan or health insurance issuer offering group or individual health insurance coverage or of a provider or facility.

**(8) Administrative fee**

**(A) In general**

Each party to a determination under paragraph (5) to which an entity is selected under paragraph (3)[5] in a year shall pay to the Secretary, at such time and in such manner as specified by the Secretary, a fee for participating in the IDR process with respect to such determination in an amount described in subparagraph (B) for such year.

**(B) Amount of fee**

The amount described in this subparagraph for a year is an amount established by the Secretary in a manner such that the total amount of fees paid under this paragraph for such year is estimated to be equal to the amount of expenditures estimated to be made by the Secretary for such year in carrying out the IDR process.

**(9) Waiver authority**

The Secretary may modify any deadline or other timing requirement specified under this subsection (other than the establishment date for the IDR process under paragraph (2)(A) and other than under paragraph (6)) in cases of extenuating circumstances, as specified by the Secretary, or to ensure that all claims that occur during a 90-day period described in paragraph (5)(E)(ii), but with respect to which a notification is not permitted by reason of such paragraph to be submitted under paragraph (1)(B) during such period, are eligible for the IDR process.

**(d) Certain access fees to certain databases**

In the case of a sponsor of a group health plan or health insurance issuer offering group or individual health insurance coverage that, pursuant to subsection (a)(3)(E)(iii), uses a database described in such subsection to determine a rate to apply under such subsection for an item or service by reason of having insufficient information described in such subsection with respect to such item or service, such sponsor or issuer shall cover the cost for access to such database.

**(e) Transparency regarding in-network and out-of-network deductibles and out-of-pocket limitations**

A group health plan or a health insurance issuer offering group or individual health insurance coverage and providing or covering any benefit with respect to items or services shall include, in clear writing, on any physical or electronic plan or insurance identification card issued to the participants, beneficiaries, or enrollees in the plan or coverage the following:

**(1)** Any deductible applicable to such plan or coverage.

**(2)** Any out-of-pocket maximum limitation applicable to such plan or coverage.

**(3)** A telephone number and Internet website address through which such individual may seek consumer assistance information, such as information related to hospitals and urgent care facilities that have in effect a contractual relationship with such plan or coverage for furnishing items and services under such plan or coverage [6]

**(f) Advanced explanation of benefits**

**(1) In general**

For plan years beginning on or after January 1, 2022, each group health plan, or a health insurance issuer offering group or individual health insurance coverage shall, with respect to a notification submitted under section 300gg-136 of this title by a health care provider or health care facility to the plan or issuer for a participant, beneficiary, or enrollee under plan or coverage scheduled to receive an item or service from the provider or facility (or authorized representative of such participant, beneficiary, or enrollee), not later than 1 business day (or, in the case such item or service was so scheduled at least 10 business days before such item or service is to be furnished (or in the case of a request made to such plan or coverage by such participant, beneficiary, or enrollee), 3 business days) after the date on which the plan or coverage receives such notification (or such request), provide to the participant, beneficiary, or enrollee (through mail or electronic means, as requested by the participant, beneficiary, or enrollee) a notification (in clear and understandable language) including the following:

**(A)** Whether or not the provider or facility is a participating provider or a participating facility with respect to the plan or coverage with respect to the furnishing of such item or service and--

**(i)** in the case the provider or facility is a participating provider or facility with respect to the plan or coverage with respect to the furnishing of such item or service, the contracted rate under such plan or coverage for such item or service (based on the billing and diagnostic codes provided by such provider or facility); and

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(ii)** in the case the provider or facility is a nonparticipating provider or facility with respect to such plan or coverage, a description of how such individual may obtain information on providers and facilities that, with respect to such plan or coverage, are participating providers and facilities, if any.

**(B)** The good faith estimate included in the notification received from the provider or facility (if applicable) based on such codes.

**(C)** A good faith estimate of the amount the plan or coverage is responsible for paying for items and services included in the estimate described in subparagraph (B).

**(D)** A good faith estimate of the amount of any cost-sharing for which the participant, beneficiary, or enrollee would be responsible for such item or service (as of the date of such notification).

**(E)** A good faith estimate of the amount that the participant, beneficiary, or enrollee has incurred toward meeting the limit of the financial responsibility (including with respect to deductibles and out-of-pocket maximums) under the plan or coverage (as of the date of such notification).

**(F)** In the case such item or service is subject to a medical management technique (including concurrent review, prior authorization, and step-therapy or fail-first protocols) for coverage under the plan or coverage, a disclaimer that coverage for such item or service is subject to such medical management technique.

**(G)** A disclaimer that the information provided in the notification is only an estimate based on the items and services reasonably expected, at the time of scheduling (or requesting) the item or service, to be furnished and is subject to change.

**(H)** Any other information or disclaimer the plan or coverage determines appropriate that is consistent with information and disclaimers required under this section.

**(2) Authority to modify timing requirements in the case of specified items and services**

**(A) In general**

In the case of a participant, beneficiary, or enrollee scheduled to receive an item or service that is a specified item or service (as defined in subparagraph (B)), the Secretary may modify any timing requirements relating to the provision of the notification described in paragraph (1) to such participant, beneficiary, or enrollee with respect to such item or service. Any modification made by the Secretary pursuant to the previous sentence may not result in the provision of such notification after such participant, beneficiary, or enrollee has been furnished such item or service.

**(B) Specified item or service defined**

For purposes of subparagraph (A), the term "specified item or service" means an item or service that has low utilization or significant variation in costs (such as when furnished as part of a complex treatment), as specified by the Secretary.

## CREDIT(S)

(July 1, 1944, c. 373, Title XXVII, § 2799A-1, as added and amended Pub.L. 116-260, Div. BB, Title I, §§ 102(a)(1), 103(a), 107(a), 111(a), Dec. 27, 2020, 134 Stat. 2759, 2797, 2858, 2861.)

## Footnotes

1 See References in Text note set out under this section.

2 So in original. There should probably be only one closing parenthesis.

3 So in original. Probably should be "given".

4 So in original. Probably should be "30-day".

5 So in original. Probably should be "paragraph (4)".

6 So in original. Probably should be followed by a period.

42 U.S.C.A. § 300gg-111, 42 USCA § 300gg-111
Current through P.L. 119-57. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

***RELEVANT PARTS OF STATUTE HIGHLIGHTED IN YELLOW***

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 6A. Public Health Service (Refs & Annos)
Subchapter XXV. Requirements Relating to Health Insurance Coverage (Refs & Annos)
Part E. Health Care Provider Requirements

42 U.S.C.A. § 300gg-132

§ 300gg-132. Balance billing in cases of non-emergency services performed by nonparticipating providers at certain participating facilities

Effective: December 27, 2020
Currentness

**(a) In general**

Subject to subsection (b), in the case of a participant, beneficiary, or enrollee with benefits under a group health plan or group or individual health insurance coverage offered by a health insurance issuer and who is furnished during a plan year beginning on or after January 1, 2022, items or services (other than emergency services to which section 300gg-131 of this title applies) for which benefits are provided under the plan or coverage at a participating health care facility by a nonparticipating provider, such provider shall not bill, and shall not hold liable, such participant, beneficiary, or enrollee for a payment amount for such an item or service furnished by such provider with respect to a visit at such facility that is more than the cost-sharing requirement for such item or service (as determined in accordance with subparagraphs (A) and (B) of section 300gg-111(b)(1) of this title [1] of section 9816(b)(1) of Title 26, and of section 1185e(b)(1) of Title 29, as applicable).

**(b) Exception**

**(1) In general**

Subsection (a) shall not apply with respect to items or services (other than ancillary services described in paragraph (2)) furnished by a nonparticipating provider to a participant, beneficiary, or enrollee of a group health plan or group or individual health insurance coverage offered by a health insurance issuer, if the provider satisfies the notice and consent criteria of subsection (d).

**(2) Ancillary services described**

For purposes of paragraph (1), ancillary services described in this paragraph are, with respect to a participating health care facility--

**(A)** subject to paragraph (3), items and services related to emergency medicine, anesthesiology, pathology, radiology, and neonatology, whether or not provided by a physician or non-physician practitioner, and items and services provided by assistant surgeons, hospitalists, and intensivists;

**(B)** subject to paragraph (3), diagnostic services (including radiology and laboratory services);

**(C)** items and services provided by such other specialty practitioners, as the Secretary specifies through rulemaking; and

**(D)** items and services provided by a nonparticipating provider if there is no participating provider who can furnish such item or service at such facility.

**(3) Exception**

The Secretary may, through rulemaking, establish a list (and update such list periodically) of advanced diagnostic laboratory tests, which shall not be included as an ancillary service described in paragraph (2) and with respect to which subsection (a) would apply.

**(c) Clarification**

In the case of a nonparticipating provider that satisfies the notice and consent criteria of subsection (d) with respect to an item or service (referred to in this subsection as a "covered item or service"), such notice and consent criteria may not be construed as applying with respect to any item or service that is furnished as a result of unforeseen, urgent medical needs that arise at the time such covered item or service is furnished. For purposes of the previous sentence, a covered item or service shall not include an ancillary service described in subsection (b)(2).

**(d) Notice and consent to be treated by a nonparticipating provider or nonparticipating facility**

**(1) In general**

A nonparticipating provider or nonparticipating facility satisfies the notice and consent criteria of this subsection, with respect to items or services furnished by the provider or facility to a participant, beneficiary, or enrollee of a group health plan or group or individual health insurance coverage offered by a health insurance issuer, if the provider (or, if applicable, the participating health care facility on behalf of such provider) or nonparticipating facility--

**(A)** in the case that the participant, beneficiary, or enrollee makes an appointment to be furnished such items or services at least 72 hours prior to the date on which the individual is to be furnished such items or services, provides to the participant, beneficiary, or enrollee (or to an authorized representative of the participant, beneficiary, or enrollee) not later than 72 hours prior to the date on which the individual is furnished such items or services (or, in the case that the participant, beneficiary, or enrollee makes such an appointment within 72 hours of when such items or services are to be furnished, provides to the participant, beneficiary, or enrollee (or to an authorized representative of the participant, beneficiary, or enrollee) on such date the appointment is made), a written notice in paper or electronic form, as selected by the participant, beneficiary, or enrollee, (and including electronic notification, as practicable) specified by the Secretary, not later than July 1, 2021, through guidance (which shall be updated as determined necessary by the Secretary) that--

**(i)** contains the information required under paragraph (2);

**(ii)** clearly states that consent to receive such items and services from such nonparticipating provider or nonparticipating facility is optional and that the participant, beneficiary, or enrollee may instead seek care from a participating provider or at a participating facility, with respect to such plan or coverage, as applicable, in which case the cost-sharing responsibility of the participant, beneficiary, or enrollee would not exceed such responsibility that would apply with respect to such an item or service that is furnished by a participating provider or participating facility, as applicable with respect to such plan; and

**(iii)** is available in the 15 most common languages in the geographic region of the applicable facility;

**(B)** obtains from the participant, beneficiary, or enrollee (or from such an authorized representative) the consent described in paragraph (3) to be treated by a nonparticipating provider or nonparticipating facility; and

**(C)** provides a signed copy of such consent to the participant, beneficiary, or enrollee through mail or email (as selected by the participant, beneficiary, or enrollee).

**(2) Information required under written notice**

For purposes of paragraph (1)(A)(i), the information described in this paragraph, with respect to a nonparticipating provider or nonparticipating facility and a participant, beneficiary, or enrollee of a group health plan or group or individual health insurance coverage offered by a health insurance issuer, is each of the following:

**(A)** Notification, as applicable, that the health care provider is a nonparticipating provider with respect to the health plan or the health care facility is a nonparticipating facility with respect to the health plan.

**(B)** Notification of the good faith estimated amount that such provider or facility may charge the participant, beneficiary, or enrollee for such items and services involved, including a notification that the provision of such estimate or consent to be treated under paragraph (3) does not constitute a contract with respect to the charges estimated for such items and services.

**(C)** In the case of a participating facility and a nonparticipating provider, a list of any participating providers at the facility who are able to furnish such items and services involved and notification that the participant, beneficiary, or enrollee may be referred, at their option, to such a participating provider.

**(D)** Information about whether prior authorization or other care management limitations may be required in advance of receiving such items or services at the facility.

**(3) Consent described to be treated by a nonparticipating provider or nonparticipating facility**

For purposes of paragraph (1)(B), the consent described in this paragraph, with respect to a participant, beneficiary, or enrollee of a group health plan or group or individual health insurance coverage offered by a health insurance issuer who is to be furnished items or services by a nonparticipating provider or nonparticipating facility, is a document specified by the Secretary, in consultation with the Secretary of Labor, through guidance that shall be signed by the participant, beneficiary, or enrollee before such items or services are furnished and that--

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(A)** acknowledges (in clear and understandable language) that the participant, beneficiary, or enrollee has been--

**(i)** provided with the written notice under paragraph (1)(A);

**(ii)** informed that the payment of such charge by the participant, beneficiary, or enrollee may not accrue toward meeting any limitation that the plan or coverage places on cost-sharing, including an explanation that such payment may not apply to an in-network deductible applied under the plan or coverage; and

**(iii)** provided the opportunity to receive the written notice under paragraph (1)(A) in the form selected by the participant, beneficiary or enrollee; and

**(B)** documents the date on which the participant, beneficiary, or enrollee received the written notice under paragraph (1)(A) and the date on which the individual signed such consent to be furnished such items or services by such provider or facility.

**(4) Rule of construction**

The consent described in paragraph (3), with respect to a participant, beneficiary, or enrollee of a group health plan or group or individual health insurance coverage offered by a health insurance issuer, shall constitute only consent to the receipt of the information provided pursuant to this subsection and shall not constitute a contractual agreement of the participant, beneficiary, or enrollee to any estimated charge or amount included in such information.

**(e) Retention of certain documents**

A nonparticipating facility (with respect to such facility or any nonparticipating provider at such facility) or a participating facility (with respect to nonparticipating providers at such facility) that obtains from a participant, beneficiary, or enrollee of a group health plan or group or individual health insurance coverage offered by a health insurance issuer (or an authorized representative of such participant, beneficiary, or enrollee) a written notice in accordance with subsection (d)(1)(B), with respect to furnishing an item or service to such participant, beneficiary, or enrollee, shall retain such notice for at least a 7-year period after the date on which such item or service is so furnished.

**(f) Definitions**

In this section:

**(1)** The terms “nonparticipating provider” and “participating provider” have the meanings given such terms, respectively, in subsection (a)(3) of section 300gg-111 of this title.

**(2)** The term “participating health care facility” has the meaning given such term in subsection (b)(2) of section 300gg-111 of this title.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(3)** The term "nonparticipating facility" means--

**(A)** with respect to emergency services (as defined in section 300gg-111(a)(3)(C)(i) of this title) and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, an emergency department of a hospital, or an independent freestanding emergency department, that does not have a contractual relationship with the plan or issuer, respectively, with respect to the furnishing of such services under the plan or coverage, respectively; and

**(B)** with respect to services described in section 300gg-111(a)(3)(C)(ii) of this title and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, a hospital or an independent freestanding emergency department, that does not have a contractual relationship with the plan or issuer, respectively, with respect to the furnishing of such services under the plan or coverage, respectively.

**(4)** The term "participating facility" means--

**(A)** with respect to emergency services (as defined in clause (i) of section 300gg-111(a)(3)(C) of this title) that are not described in clause (ii) of such section and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, an emergency department of a hospital, or an independent freestanding emergency department, that has a direct or indirect contractual relationship with the plan or issuer, respectively, with respect to the furnishing of such services under the plan or coverage, respectively; and

**(B)** with respect to services that pursuant to clause (ii) of section 300gg-111(a)(3)(C) of this title, of section 9816(a)(3) of Title 26, and of section 1185e(a)(3) of Title 29, as applicable are included as emergency services (as defined in clause (i) of such section and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, a hospital or an independent freestanding emergency department, that has a contractual relationship with the plan or coverage, respectively, with respect to the furnishing of such services under the plan or coverage, respectively.

**CREDIT(S)**

(July 1, 1944, c. 373, Title XXVII, § 2799B-2, as added Pub.L. 116-260, Div. BB, Title I, § 104(a), Dec. 27, 2020, 134 Stat. 2824.)

**Footnotes**

1 So in original. Probably should be followed by a comma.

42 U.S.C.A. § 300gg-132, 42 USCA § 300gg-132
Current through P.L. 119-57. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.